[L. A. No. 5498. In Bank.—February 25, 1921.]

## E. T. EARL et al., Respondents, v. THE TIMES-MIRROR COMPANY (a Corporation), et al., Appellants.

[1] LIBEL—MALICE—EVIDENCE—PREVIOUS PUBLICATIONS.—In an action for libel, previous publications, even of a dissimilar nature, may be properly received in evidence for the purpose of establishing malice.

[2] ID.—PROVOCATIVE ARTICLES — ERROR IN REJECTION — BURDEN OF PROOF.—Where in an action for libel between rival newspaper publishers the trial court sustained the contention of the defendants that any publication of the plaintiff which related to, induced, tended to explain or was in any way connected with the articles, or any of the articles, of defendants offered to prove malice, was admissible, it is incumbent upon the defendants seeking to show error in the rejection of a certain number of such publications to point out their relevancy and importance in the case.

[3] ID. — REMOTENESS OF ARTICLES — DISCRETION—APPEAL.—In an action for libel between rival newspaper publishers the court has a discretion in determining whether or not articles of the plaintiff offered for the purpose of showing provocation are too remote in time or in effect to be admissible, which determination will not be disturbed on appeal if the discretion is reasonably exercised.

[4] ID.—PLAINTIFF'S FEELINGS AND BELIEF—ADMISSIBILITY OF EVIDENCE. In an action for libel, testimony of plaintiff's belief respecting the influence that the libel had upon the feelings of his wife, and also respecting his own sympathetic sufferings in consequence thereof, is admissible.

[5] ID.—LIBELOUS RETORT TO LIBEL—INSTRUCTION.—In an action for libel, an instruction that the law justifies one in repelling a libelous charge by denial or an explanation, and if done in good faith and without malice, it is privileged, though false, even if a correct statement of the law, which may well be doubted in view of section 47 of the Civil Code, which expressly defines what articles are privileged and what are not, is properly refused where the article complained of is neither a denial nor an explanation, or a fair answer to the charge, but merely a libelous retort.

[6] ID. — DAMAGES — INJURY TO DEFENDANTS—SUBTRACTION FROM PLAINTIFF'S DAMAGES—INSTRUCTION.—In an action for libel between rival newspapers, an instruction advising the jury that they could not subtract from the damages which they found the plain-

---

6. Proper elements of damages in action for libel or slander, note, 72 Am. Dec. 421.

tiff was entitled to any offset due to damages to the defendants was correct.

[7] ID.—NOMINAL DAMAGES—INSTRUCTION.—In an action for libel, the refusal to instruct the jury that they might render a verdict for nominal damages if they found that the libel was published without malice and that the plaintiff was not appreciably damaged thereby was not erroneous where the jury was instructed that only compensatory damages could be awarded, and a verdict of twenty-five thousand dollars compensatory damages was returned.

[8] ID.—PROVOCATIVE ARTICLES—MITIGATION OF PUNITIVE DAMAGES—INSTRUCTION.—In an action for libel between rival newspaper publishers, refusal to instruct the jury that provocative articles might be considered in mitigation of compensatory damages, and instructing them that such articles could only be considered in mitigation of punitive damages, was proper.

[9] ID.—CONDUCT OF JUROR ON VOIR DIRE—INSUFFICIENT GROUND FOR NEW TRIAL.—A new trial in an action for libel between rival newspaper publishers is properly denied where based upon the alleged misconduct of a juror on his *voir dire* in stating that he could fairly and impartially try the case, and his failure to volunteer the information that about six weeks before his examination he had become angry at the editorial policy of the defendants' newspaper and stopped his subscription.

[10] ID.—COMPENSATORY AND PUNITIVE DAMAGES—DEFECTIVE VERDICT AS TO PUNITIVE DAMAGES.—Where in an action for libel the jury returned a verdict for compensatory damages of twenty-five thousand dollars against all the defendants, and a verdict of five thousand dollars punitive damages against the defendant corporation alone, and when the jury were polled it developed that nine of the jurors were in favor of the twenty-five thousand dollars compensatory damages and ten jurors in favor of the five thousand dollars punitive damages, but three of the jurors who voted for five thousand dollars punitive damages did not concur in the verdict for twenty-five thousand dollars compensatory damages, and two of the jurors who did not concur in the five thousand dollars punitive damages were in favor of the twenty-five thousand dollars compensatory damages, the verdict for punitive damages cannot stand.

[11] ID.—CHARGE AGAINST RIVAL NEWSPAPER PUBLISHER—DEFENDER OF DEGENERATES FOR HIRE—VERDICT NOT EXCESSIVE.—In this action for libel, the verdict of twenty-five thousand dollars compensatory damages for the publication of a newspaper article charging the publisher of a rival newspaper with being a defender of degenerates for hire cannot be said, in view of the uncontradicted facts, to have been rendered under the influence of passion or prejudice.

[12] ID.—COUNTER LIBEL—PLEADING.—In an action by one newspaper publisher against the publisher of a rival newspaper for libel, the defendant cannot set up by either cross-complaint or counterclaim a cause of action for damages for a libel published concerning him by the plaintiff at a different time, for they are separate and distinct transactions.

[13] ID.—DEFENDER OF DEGENERATES FOR HIRE—LIBELOUS PER SE.—A newspaper article charging the publisher of a rival newspaper with being the defender of degenerates for hire is libelous *per se,* since it accuses the latter of conduct so reprehensible that it must necessarily affect his standing in the community and expose him to obloquy and contempt.

[14] ID.—STATUS OF NEWSPAPER PUBLISHER—INSUFFICIENT WARRANT FOR LIBELOUS ATTACKS.—The fact that a person is a publisher of a newspaper does not justify libelous attacks upon him on the theory that he is a public character.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

Daniel M. Hunsaker, Hunsaker, Britt & Edwards, Hunsaker, Britt & Cosgrove, Robert B. Murphey, Samuel Poorman, Jr., and Leon R. Yankwich for Appellants.

Edwin A. Meserve, Shirley E. Meserve, Joseph Scott and Anderson & Anderson for Respondents.

WILBUR, J.—This is an action for libel in which E. T. Earl recovered judgment for the sum of thirty thousand dollars. The defendants appeal. The article complained of was published in the "Los Angeles Times" of December 3, 1914. E. T. Earl was the publisher and owner of two daily newspapers, the "Los Angeles Express," an evening newspaper, and the "Los Angeles Tribune," a morning newspaper, while the defendant corporation published the "Los Angeles Times," a daily morning newspaper, and the other defendants were also engaged in the publication of that newspaper.

The article complained of by the plaintiff is as follows:

"Defense of Degenerates.

"The theory of the editor of the Morning Sodomite and the Evening Degenerate seems to be that those who violate the laws of God and man should be protected from punishment and sheltered from publicity, while those newspapers whose proprietors publish the news, and by so doing aid decent people to avoid ignorantly contaminating their households with well-dressed, cultivated Pharisaical moral lepers, are to be denounced as 'brutal journalists.'

"The Toopious system is to coddle criminals, to conceal their crimes, and to denounce those who expose crime as 'brutal journalists.' The system of the Times is to publish the news, and if the news includes an account of the misdoings of a lot of pretentious Pharisees, who are as lecherous as goats and as conscienceless as jackasses in April, the acts of the evil-doers will be exposed, notwithstanding the purchased defense of the editor of the Morning Sodomite and Evening Degenerate."

Pending the appeal the respondent, E. T. Earl, has died and the executors and the executrix of his estate have been substituted as plaintiffs. We will, however, refer to E. T. Earl as the plaintiff. In their concluding brief respondent's counsel state: " . . . In view of the importance of this case to our client's memory, and in view of the fact that a reversal upon technical grounds would mean a complete termination of this action without any opportunity whatever for a retrial and the vindication of Mr. Earl against the vicious attacks of the defendant newspaper, we have felt impelled to exercise the utmost care" in presenting this case. Therefore, before considering the various points advanced for a reversal of this case it may be well to state at the outset that the defendants do not count upon the truth of the article published and throughout their briefs concede that the inferences against the character of Mr. Earl contained in the article were not true, but claim that the article was merely a journalistic fling in retaliation for similar attacks made upon the defendant, H. G. Otis, and the "Los Angeles Times." In short, the defense is that this publication is but one item in an extended and acrimonious newspaper controversy; that it was provoked by articles published by the plaintiff in his newspapers concerning defendants and should only be considered in the light of this

controversy and as a part of it and not as a separate and independent charge against plaintiff. This being true, there was not, and is not now, any issue as to the moral character of Mr. Earl, and our decision one way or the other cannot affect that question.

[1] The first question very elaborately presented in the briefs, as defendants' counsel concede in their final briefs, is determined in the case of *Scott* v. *Times-Mirror Co.*, 181 Cal. 345, [12 A. L. R. 1007, 184 Pac. 672], wherein it was held that previous publications even of a dissimilar nature might be properly received in evidence for the purpose of establishing malice.

### Provocation.

Thirty editorials and cartoons from the "Los Angeles Tribune" and the "Evening Express" were received in evidence on behalf of the defendants for the purpose of showing provocation, while twenty others, offered for the same purpose, were rejected, and the ruling of the court excluding them is assigned as error. [2] In view of the fact that the trial court fully sustained the contention of the appellants, namely, "that any publication of the plaintiff which related to, induced, tended to explain, or was in any way connected with the articles, or any of the articles, of defendant offered to prove malice was admissible," and admitted a large number of articles upon that theory, it is, as respondent contends, "incumbent upon the defendants seeking to show error in the rejection of these various publications to point out in each instance its relevancy and importance in the case." The appellant does not discuss in detail the particular objections interposed to each offer of the rejected evidence or the theory upon which they were sustained by the trial court. The rejected articles are classified by the appellant under four heads, first: "Articles wherein the journalistic activities and business of defendant Otis are excoriated." Second: "Articles charging defendant Otis, and the owners of the 'Times,' with hypocrisy." Third: "Articles charging defendant Otis and the 'Times' with dishonesty of assorted varieties, chiefly of a political character." Fourth: "Articles, according to defendants, the customary journalistic amenities."

Nine articles are classified under the first head, five of which were published in 1911, three in 1913, and one in

1914. It appears from the transcript that the objection to some of these articles was sustained on the ground that they were too remote. Under the second head three articles are classified, one dated October 30, 1914, another dated July 21, 1911, and one dated January 30, 1913. Under the third head four articles are listed, three of them dated in 1911, one in 1913, and under the fourth, one article, dated April 11, 1914. [3] As the trial court fully recognized the principle involved in the introduction of these articles and the objection is on the ground of remoteness, or of its probable effect on or connection with the article published, and as a large number of articles were received in evidence which cover the same general ground, the trial court must have some discretion in determining whether or not articles are too remote in time or in effect to be admissible. This discretion, if reasonably exercised, ought not to be interfered with on appeal unless it can plainly be seen that it has been abused. It is evident from the record that the defense of provocatory articles was fully presented to the jury. In view of the fact that the appellant has not more specifically pointed out the alleged error of the trial court in rejecting this evidence, we think it unnecessary to discuss the matter further.

Evidence of Plaintiff's Feelings and Belief.

[4] It is next contended by the appellants that "The court erred in admitting the testimony of plaintiff's belief respecting the influence that the libel complained of had upon the feelings of his wife, and also his testimony respecting his own sympathetic sufferings in consequence." One of the elements entering into damages for a libel is the injury to the feelings of the person libeled. That injury may be inferred by the jury from the testimony with relation to the social status of the person libeled. There seems to be no good reason, however, why this inference should not be supplemented by the direct statement of the plaintiff to the effect that his feelings were injured and that he did believe that the community were influenced by the publication and that the members of his family were affected thereby. Such testimony is not received to establish the actual effect upon the community or upon the members of his family but to prove the effect upon himself. The general purport of the defense in this case is that the libel

occurred in a prolonged newspaper controversy which nobody took very seriously, not even the newspapers themselves. If the plaintiff also took this view of the matter it is clear that his feelings were not greatly injured, whereas, on the other hand, if he believed, as he testified he did, that it had affected his standing in the community and the happiness of members of his family, it was clearly proper for him to so testify, as tending to prove the injury to his feelings. Appellants state that the record would seem to indicate that the evidence must have been proffered and admitted upon the untenable theory that plaintiff's belief—irrespective of its being a correct belief—constituted an element of damages for which plaintiff was entitled to recover, namely, injury done to him through his sympathetic participation in what he took to be his wife's resulting humiliation and sadness. Appellants call attention to *Dennison* v. *Daily News Publishing Co.*, 82 Neb. 675, [23 L. R. A. (N. S.) 362, 118 N. W. 568], in which it was held that the plaintiff should not have been allowed to testify to his wife's agitation on reading the newspaper publication and that her crying worried him all the time, so that he could not eat or sleep as he had been accustomed to. The plaintiff here did not testify to the effect of the article upon his wife, or of her grief, if any, upon him, but merely as to his own belief as to its effect upon her. That is to say, as to its effect upon his own mind. The case of *Couch* v. *Mining Journal Co.*, 130 Mich. 294, [89 N. W. 936], is cited to the same effect. In that case the plaintiff sought to prove the effect upon the members of his family, which was held to be improper, while in this case the court was careful to instruct the jury that they were not to consider the plaintiff's testimony as evidence of the fact that the wife was affected by the article. The case of *Sheftall* v. *Central of Georgia Ry. Co.*, 123 Ga. 589, [51 S. E. 646], is also cited to the same effect. The distinction between these cases and the one at bar may be made manifest by an illustration. Suppose that a man feared that his wife might commit suicide when she read the article in question? This belief, however erroneous it might be, is one which would cause him mental suffering. The wife might commit suicide and neither that fact nor the effect of the suicide upon the husband could be offered in evidence to establish

the measure of his damages. On the other hand, the wife might take a very cheerful view of the situation and comfort her husband instead of committing suicide. In either view the plaintiff is entitled to recover for such mental worry as is proximately caused by the article, although not by the mental worry caused by the suicide, for such worry would not be a proximate result of the article. A similar conclusion was reached by the circuit court of appeals in the case of *S. S. McClure Co.* v. *Philipp*, 170 Fed. 910, [96 C. C. A. 86], where the plaintiff was permitted to testify, over objection, that when he read the libel he was much distressed because of the effect it would have upon his family, friends, business acquaintances, and his social and financial standing. It was there said: "It is quite true that in, perhaps, the majority of cases the question is presented to the jury as a deduction from established facts. In the case at bar, with all the facts relating to the plaintiff's domestic, social, and business relations established, argument as to effect of the false charges upon his mind might, it would seem, have been presented as effectively without the testimony complained of as with it. Before coming to the question of damages the jury necessarily had to reach the conclusion that the defendant had falsely accused the plaintiff of being a criminal, and the conclusion that he had suffered great mental anguish from such a charge would naturally follow. But what may be considered by the jury may be proved, and where the question relates to the mental suffering of the plaintiff no witness can speak *ex cathedra* but the plaintiff himself." To the same effect is the case of *Chesley* · v. *Tompson*, 137 Mass. 136. While the question of such mental suffering might ordinarily be most properly left to be inferred by the jury, it is evident that under the peculiar circumstances of this case the plaintiff felt compelled to offer direct testimony on that subject. There was no error in the reception of this evidence.

Instructions as to a Libelous Retort to a Libel.

[5] The defendants complain of the refusal of the trial court to give the following instruction: "The law justifies one in repelling a libelous charge by denial or an explanation, . . . and if he does so in good faith and what he publishes is fairly an answer and is published for the purpose of repelling the charge, and the same is not published

with malice, it is privileged though false." Even if this instruction were a correct statement of the law, which may well be doubted, in this state, where the statute itself expressly defines what articles are privileged and what are not (Civ. Code, sec. 47), it is sufficient to say that the principle of law has no application to the case at bar. The article complained of does not in any sense comply with the specifications in the instruction as to what constitutes a privileged communication. It is neither a denial nor an explanation, nor a fair answer to the charge, and for that reason, under the instruction, as submitted, it could not be "privileged though false." It would be germane to the discussion of this point to state at this time the nature of the so-called "newspaper controversy," but we will postpone that statement to a later portion of this opinion, but such statement will emphasize what we have just said. It is sufficient at this time to say that the appellants' claim of the relevancy of the instruction to the facts in the case at bar is thus summarized by them: "In brief, plaintiff accused defendant of being a character assassin, either for hire or for the money that was to be made out of printing sensational items of news looking to the ruining of private reputations, and defendant replied in kind that plaintiff's silence with regard to crime—and particularly with regard to crimes of the character of those committed by the Long Beach perverts—constituted a defense of the guilty to which plaintiff was moved for what there was in it, and also, that his attacks upon defendants for their journalistic policy was pharisaical." Accepting this statement for the moment as a fair characterization of both articles, it appears therefrom that defendants merely replied to one libel by another one of a somewhat similar type. This course is not approved by the law.

Appellants' contention, when applied to the facts of this case, amounts to the proposition that one libel can be repelled by one of similar import. The instruction was properly refused.

Instruction as to Relevancy of Injury to Defendants.

[6] The appellants complain of the giving of the following instruction during the progress of the argument of defendant's counsel: "The question of any injury that may have been done Mr. Otis or Mr. Chandler or Mr. Andrews

is wholly irrelevant to any of the issues in this case, and not to be considered by the jury.'' This instruction resulted from a prolonged colloquy between court and counsel during the argument. The defendants' counsel was arguing to the jury that the plaintiff had not shown a dollar's worth of injury. Plaintiff's counsel protested to the court against the propriety of the defendants' argument on the ground that as there were no special damages plead in the complaint, they were not entitled to prove damages in terms of dollars, but that they were limited to presenting the facts and circumstances of the plaintiff to the jury who were therefrom to appraise the injury to the plaintiff. During the course of this colloquy respondent's counsel stated: ''The Court: What is the instruction asked? Mr. Meserve: I want your Honor to instruct the jury that Mr. Earl could not make proof to this court of any damages in this case except by the showing of his standing in the community, his position, the character of his business, and his family. He could make no proof of special damages or special money loss. The Court: Gentlemen of the jury, you are instructed that Mr. Meserve's statement of the law is adopted as correct by the court in its application to this case wherein there is no claim in the plaintiff's complaint for any special damages.'' Thereupon, Mr. Beach, arguing the case for the defendants, said: ''Well, gentlemen, since his Honor's instruction and Mr. Meserve's objection, we are confined to the question of Mr. Earl's feelings. Was Mr. Earl hurt one bit more by that publication than Harry Andrews or Harry Chandler or General Otis, sitting over there, when they came out with that publication calling him a pervert?'' To this respondent's counsel objected, stating, among other things: '' . . . They cannot offset one libel against another, or one damage against another, and the jury are not to consider that question at all.'' Thereupon the court gave the above instruction. We think it must have been clear to the jury, from the foregoing colloquy and from other portions which we will not quote, that the purpose of the instruction was to advise them that they could not subtract from the damages they found plaintiff was entitled to, any offset due to damages to the defendants. So understood the instruction was correct.

It was evidently not intended, either by the court or by respondent's counsel by this instruction, asked and given during the argument, to completely reverse the rulings which had been uniformly made by the court during the trial that such articles as were offered on behalf of the defendants to show provocation were relevant. The court consistently ruled that the provocation was relevant matter, and in the instructions to the jury, given after the argument, the relevancy of the evidence of provocation was fully explained to the jury. We do not think the jury could have been misled by the instruction under consideration, even if it were not literally true that the feelings of the defendants were irrelevant.

Their feelings were relevant, and the court so instructed the jury upon the question of provocation and thus indirectly upon the question of the amount of punitive damages.

Refusal of Instruction Authorizing Nominal Damages.

[7] Appellants next complain of the fact that the court refused to give several instructions to the effect that the jury might render a verdict for nominal damages if they found that the libel was published without malice and that plaintiff was not appreciably damaged thereby. The defendants are not entitled to such an instruction. As the jury were instructed that they could only award compensatory damages, if they found that there had been no actual damage suffered, the verdict, without the instruction, would necessarily be for the defendant. The instructions asked, therefore, instead of being to the advantage of the defendants, would be to the advantage of the plaintiff, for they are to the effect that the jury must bring in a verdict for at least nominal damages even if they found there was no substantial injury. In any event, the verdict of the jury having been for twenty-five thousand dollars compensatory damages, error cannot be predicated upon the fact that the court failed to instruct them that they could, if in their judgment no damages whatever were suffered, allow nominal damages.

The Nature of the Newspaper Controversy.

A further statement of facts is necessary in order that the situation presented by the record may be understood.

The "Los Angeles Times" had published the fact that some thirty or more residents of Long Beach had been convicted of the charge euphoneously described as "social vagrancy." It had also published an account of the arrest of an agent of a charitable corporation who was charged with the offense of rape upon one of his wards. The plaintiff's newspapers characterized these publications as "brutal journalism" and roundly denounced the course of the defendants' newspaper in making such publications. The defendants in reply took the position that it was the proper function of a newspaper to print these news items. This controversy has been extended into the briefs in this case and each side not only contends for the righteousness of its own position but also denounces the attitude of its opponent. Whether or not such publications should be made is one of the difficult problems of all newspapers which claim to publish all matters of current interest. On the one hand the emphasis is put upon the welfare and the desires of the public and, on the other hand, upon the welfare of the individual and the corresponding welfare to the public. The various articles and cartoons published in the course of this controversy were all admitted in evidence. The plaintiff's newspaper, "The Tribune," in addition to denouncing the defendants' newspaper for its "brutal journalism," printed a cartoon entitled "The Brute" on December 1, 1914, to which it is claimed the article herein sued upon was a legitimate reply. The central figure in the cartoon is a hog wearing eye-glasses, and with a pencil over his left ear. The hog is dressed in a man's clothing, and has features characterizing those of a man. The nostrils are indicated by a dollar-sign. Its snout and left fore foot are dripping with mud from a mud-hole. This mud-hole in which the hog is wallowing is labeled "Filth"; "Indecency"; "Character assassination"; "Salaciousness" and "Unverified rumor." The hog is pictured as saying "This story will wreck a dozen innocent lives but—I should worry." The purpose and effect of the cartoon is thus described in the innuendo of the cross-complaint of the defendant corporation, to wit: "That in and by said cartoon plaintiff intended to charge, and was understood by the readers of said paper as charging, that cross-complainant is a brute; that it is a hog; that, like that animal, it wallows in filth and

indecency; that it is an assassinator of character; that salacious matter and unverified rumor is its entire stock in trade, and that it uses both to ruin the lives of men and women; that it is controlled neither by conscience nor feeling; that it carries on its business in a brutal and conscienceless manner; that it practices constantly, and is the embodiment of, brutal journalism; and that it is controlled and actuated solely by a desire to accumulate money, regardless of the means employed to accomplish that purpose. That each of said charges is false and untrue, and was known by plaintiff to be false and untrue when made by him, as herein alleged.''

Provocation in Mitigation of Compensatory Damages.

[8] It is claimed that the court erred in refusing to instruct the jury that the articles and cartoons published by plaintiff and set up in the answer might be considered in mitigation of compensatory as well as punitive damages. The court did instruct the jury that such cartoons and articles might be considered in mitigation of exemplary damages. The court also instructed the jury that if it appeared from the evidence that there existed between the newspapers a newspaper controversy, the jury could also consider the *fact of such controversy* in determining the amount of compensatory damages. In other words, that *provocation*, considered as a separate and distinct element in the case, was only to be considered as disproving actual malice or mitigating the punitive damages resulting from actual malice. But the articles relied on as showing provocation might also establish the fact that a newspaper controversy was in progress, and the fact of such a controversy was entitled to be considered by the jury in assessing compensatory damages. By these instructions all the defendants who were responsible for the libel, whether aware of the provocative articles or not, were responsible for the same amount of compensatory damages. Defendant H. G. Otis, for instance, who knew nothing about the provocative articles or about the article made the basis of plaintiff's complaint, was assessed for the same amount of compensatory damages as was the defendant Harry Andrews, who knew of the provocative articles and approved the article complained of by the plaintiff. If merely provocative articles are to mitigate compensatory damages, it would seem to fol-

low inevitably that the amount of the verdict against the different defendants should have been for different amounts, according to whether or not the respective defendants were thereby provoked.

It is evident that the articles of the plaintiff may be characterized both as provocative and controversial. In the first aspect the court instructed the jury that the article should only be considered in mitigation of punitive damages based upon malice. On the other subject the jury were instructed that they had a right to take the controversy into consideration in determining the amount of compensatory damages awarded to the plaintiff. It is not necessary for us on this appeal to determine whether or not the court was correct in its instruction to the effect that the controversy could be taken into consideration in determining the amount of compensatory damages, as this instruction is to that extent, at least, in harmony with the contentions of the appellant, and if it is true that the defendants were not entitled to have the compensatory damages mitigated because of provocation, the appellants cannot complain of the instructions. We think it clear that under our practice wherein an award may be made for both compensatory and punitive damages that the only purpose of showing provocation is for the purpose of mitigating the punitive damages which might otherwise result from the finding of malice. If there is no punitive damages imposed by the jury, then the question of provocation becomes of no moment on the question of damages. In so far as such articles were a part of a controversy between the papers, they were received in evidence and the court instructed the jury to consider the controversy in connection with the question of compensatory damages. Whatever may have been the ancient rule, particularly in jurisdictions where the distinction between punitive and compensatory damages is not carefully maintained, it is clear that the instruction of the jury limiting the effect of the provocative articles to the exemplary damages was correct. (25 Cyc. 523; *Taylor* v. *Hearst,* 118 Cal. 366, [50 Pac. 541]; *Turner* v. *Hearst,* 137 Cal. 232, [Ann. Cas. 1914D, 894, 70 Pac. 18].)

### Juror's Alleged Misstatement on His *Voir Dire.*

[9] It is claimed that the court erred in refusing a new trial upon the ground of the misconduct of a juror named

William Noble. It is contended by appellants that his testimony upon the *voir dire* was so false and misleading as to constitute misconduct on his part by which the defendants were surprised into accepting him as a juror.

Upon his *voir dire* he was questioned and answered as follows:

"Q. Which one of the daily papers do you take? A. I am not subscribing for either one of them at the present time. Q. But as a rule? A. The 'Times,' usually; sometimes I read them both. Q. So far as you know, there is nothing in your own mind that is in any way prejudicial to either party, plaintiff or defendant, in this case? A. No, sir. Q. And you know of nothing that would cause you to hesitate to accept the responsibilities of a juror in this case? A. No, sir. Q. Mr. Noble, have you any feeling of prejudice or bias against the 'Times' or any of the defendants? A. No, sir. Q. If selected as a juror in this case, would you be guided solely by the evidence adduced here, and the law as given you by the court? A. Yes, sir. Q. Did you say whether you take either of those papers— the 'Times,' the 'Tribune' or 'Express'? A. I am not taking either one of them regularly; I buy them occasionally. Q. Do you take any paper? A. As I say, I buy them —I am not a subscriber for either one. Q. Not a subscriber for any Los Angeles paper? A. No, sir. Q. You say, you buy any of them and read any of them? A. I buy the 'Express,' 'Tribune' or 'Times' generally once a day, one or the other of them. Q. If you were a litigant would you be willing to have your cause tried by twelve men each of whom entertained the same feelings toward the parties and the matters in controversy that you do in this case? A. Yes, sir."

Upon the motion for a new trial the defendants offered an affidavit of Charles Burton, who was in charge of the "Times" route covering the district within which the juror Noble resided, who made affidavit that on October 2, 1916, he had called upon said Noble for the purpose of collecting the subscription rate for the previous month; that Noble then stated: "I don't want the 'Times' any more; I want you to stop my subscription to the paper. I have nothing against you personally, but since the 'Times' came out for the wets I have decided to stop it. . . . There are one or

two saloons in the block in which I own property, and the saloons are a detriment to my property and an injury to me and I will not support a paper that supports the wet proposition. . . . The 'Times' is always knocking the laboring man, and for that reason I have no use for the editorial policy of the paper." The affiant further stated: "That at that time said Noble appeared from his manner and tone of voice incensed against the policies of said 'Los Angeles Times.'" The examination of the juror on his *voir dire* occurred November 16, 1916.

George P. Adams, one of the attorneys for the defendants, made affidavit for use on the motion for a new trial that on November 30, 1916, Mr. Adams casually met Mr. Noble and in the course of the conversation Noble stated: "If affiant had pressed the said Noble upon his examination touching his qualifications as a juror that the said Noble would have been compelled to have stated that he had been a subscriber to the 'Times,' but that he had become so enraged at the said 'Times' that he had fired it from his home, but that as he was not asked the question he did not volunteer the information."

The defendants argue their right to a new trial on the theory that the statement made on October 2, 1916, to the reporter and the one subsequently made to Mr. Adams convict the juror of perjury in his answers on *voir dire* wherein he stated that there was nothing in his own mind in any way prejudicial to either party and nothing which would cause him to hesitate to accept the responsibility of a juror; that he had no feeling of bias or prejudice against the "Times" or any of the defendants; that he would try the case on the evidence adduced, and that if he were litigant he would be willing to have the case tried by a juror who was in the same frame of mind as he was toward the parties in the matters in controversy in the case. At the threshhold of the matter the question that presents itself is this: Does the fact that a month and a half before he was examined as a prospective juror he made the statements attributed to him while angry at the "Times" for its editorial policy concerning prohibition and labor matters show his testimony to be false, or prove him, notwithstanding his direct statements to the contrary, to be so prejudiced as to require a new trial of the case? It is to be noted that he had at that

time become angry with the newspaper and terminated his
subscription thereto, but according to his testimony given at
the trial he continued to read the "Times" more frequently
than either of the other papers. He expressed no opinion
concerning the merits of the controversy that was to be
tried in court and he swears that he felt himself competent
to decide that controversy on the merits. As to the state-
ments made to Mr. Adams it is evident that the juror had
fully in mind at the time he testified the fact that he had
stopped his subscription to the "Times" and was prepared
to make that statement if the questions had been directed
to that point. Instead of a confession of a guilty withhold-
ing of information it seems to be an indication that he was
perfectly willing and intended to answer the questions fully
and fairly if they were propounded. Any juror who has
been long in court knows how strenuously counsel object to
any volunteer information given by witnesses under exami-
nation. Such volunteer statements are almost invariably
stricken out instantly by the court upon motion as not re-
sponsive to the question.

Unless we are prepared to indulge in the presumption
of guilt rather than that of innocence, it must be apparent
that in the mind of the juror there was nothing inconsistent
between his statement that he could try the case fairly and
impartially and the fact that six weeks before he had
in a fit of anger stopped his subscription to the "Times."
If the witness upon his *voir dire* had been asked the very
questions which it is now suggested that he evaded, namely,
whether or not he had at any time stopped his subscrip-
tion to the "Times" because he was angry with the edi-
torial policy of the paper, and, if he had answered in the
affirmative and had stated that notwithstanding that fact he
could fairly try the case and the court under those circum-
stances had accepted him as a juror, the action of the trial
court would have been sustained on an appeal. The case
differs altogether from numerous cases cited by the appel-
lants in their brief, wherein jurors either had expressed an
opinion upon the merits of the case which they were about
to try or had indicated a desire to get upon a jury for the
purpose of deciding the case against one of the parties.
It is apparent from the foregoing discussion that the order

of the trial court denying a new trial cannot be reversed for the reason stated.

### As to a Defective Verdict.

[10] The next point urged by the appellants is that the court erred in refusing to grant a new trial upon the ground of the failure of the jury to agree upon a verdict. It appears that the jury returned two separate verdicts—the first, a verdict for compensatory damages of twenty-five thousand dollars against all the defendants; second, a verdict of five thousand dollars punitive damages against the defendant corporation alone. When the jury were polled it developed that nine of the jurors were in favor of the twenty-five thousand dollars compensatory damages and ten jurors in favor of the five thousand dollars punitive damages, but three of the jurors who voted for five thousand dollars punitive damages did not concur in the verdict for twenty-five thousand dollars compensatory damages, and two of the jurors who did not concur in the five thousand dollars punitive damages were in favor of the twenty-five thousand dollars compensatory damages. Only seven of the individual jurors, when polled, stated that they concurred in both verdicts. The following occurred on the polling of the jury:

"The Court: Poll the jury, Mr. Clerk, first on the question of compensatory damages. Gentlemen of the jury, this is now on the twenty-five thousand dollar portion of the verdict for the plaintiff. If it is your verdict, answer yes.

"The Clerk: Mr. Ives, is this your verdict?

"Juror Ives: Your Honor, there were two votes—whether there was any compensatory damages, then the amount.

"The Court: The question is, Mr. Ives, is this your verdict?

"Juror Ives: Can I answer that in part?

"The Court: No; the question is merely, did you and do you agree to this verdict which is returned here?

"Juror Ives: No, sir.

"The Clerk: Mr. Shafer, is this your verdict?

"Mr. Scott: Could they not—

"The Court: They are being polled as to compensatory damages.

"Juror Shafer: And, your Honor, it is not a poll as to whether we find for the plaintiff or not?

"The Court: No; the poll is whether you agree in this verdict which has been returned, namely, a verdict for the plaintiff in the sum of twenty-five thousand dollars as compensatory damages.

"Juror Shafer: No."

Juror Adams also answered "no" and the others "yes." Whereupon the clerk announced, "nine 'yes,' your Honor, three 'no.'" The court thereupon directed the clerk to poll the jury upon the question of punitive or exemplary damages against the defendant Times-Mirror Company. Jurors Noble and Sydnor voted "no," all the others "yes," whereupon the following occurred:

"Mr. Beach: I now move for a judgment for defendants, nine jurors not having agreed upon a verdict, there being five of them who have not agreed.

"The Court: I do not understand what you mean.

"Mr. Beach: It is one of our contentions in this case that there can be but one verdict.

"The Court: Oh, the motion is denied."

It is clear that the point now insisted upon here was not made clear to the court at that time, namely, that the defendants contend the same nine jurors must agree upon both items of the verdict.

It should be observed that the jurors who dissented from the twenty-five thousand dollars compensatory damage verdict were not given the opportunity of explaining their position at all. They may have been in favor of a larger verdict. Juror Ives volunteered the proposition that the jurors first voted upon whether or not there should be any compensatory damages and then took a second ballot on the amount. When Juror Ives asked if he could answer the question in part the court informed him that his answer must be "yes" or "no."

There can be no question under this state of facts that nine jurors having agreed upon a verdict of twenty-five thousand dollars compensatory damages against all the defendants, that a judgment against all the defendants following this verdict would be proper. Whether or not the verdict of thirty thousand dollars against the "Los Angeles Times," which includes an item of five thousand dollars punitive damages, can be sustained is not so clear. Two of the jurors, Noble and Sydnor, who voted for twenty-five

thousand dollars compensatory damages, voted against the imposition of the five thousand dollars punitive damages upon the defendant corporation. The question is whether two jurors who voted against the item of twenty-five thousand dollars compensatory damages and who voted for the five thousand dollars punitive can properly be considered in place of the two jurors who voted for twenty-five thousand dollars compensatory damages and against the punitive damages to make the nine necessary to return a verdict. It is true, as counsel stated to the trial court, in one sense, that the verdict is an entirety. That is to say, the net result of any verdict is the imposition of a judgment against the defendant for a certain amount fixed in the verdict. So far as the judgment is concerned and the collection thereof, it is utterly immaterial whether the damages are classified as punitive or compensatory. They constitute the amount of the award made by the court in favor of the plaintiff. The only reason for segregating items of punitive and compensatory damages is to aid the trial court and the appellate courts to determine the basis upon which the jury has acted. It is always desirable for that reason to segregate the verdict, so that if it appears from the verdict that the jury has made no award whatever for punitive damages the rulings of the trial court and the instructions with reference to punitive damages, although erroneous, may be seen to be without prejudice to the parties in view of the fact that no punitive damages are allowed. The advantage of such segregation is manifest here for the reason that it appears that nine jurors concurred in the verdict of compensatory damages against all the defendants and thus such verdict can stand, notwithstanding the complications arising with reference to the question of punitive damages. The total verdict against the "Los Angeles Times" is thirty thousand dollars. It is clear from the record that only seven jurors united in the determination that the defendant corporation should pay thirty thousand dollars; to wit, twenty-five thousand dollars compensatory and five thousand dollars punitive damages. It is clear, therefore, that the verdict for punitive damages cannot stand against the corporation. In aid of the verdict we might assume that the two jurors who were not allowed to express their opinion on compensatory damages other than to say that they

did not agree in the amount of the verdict as returned fixed the compensatory damages at a higher figure. Even with this assumption, however, such jurors did not concur in the verdict as rendered, and not being willing to join therein, either because this verdict was too large or too small, their votes cannot be now considered as giving validity thereto. If the objection of the appellants had been made more clear to the court at the time the verdict was returned, the matter could have been quickly cleared up by questions that would show the exact status of the jurors and by then requiring the jury to retire for further deliberation. The procedure upon such a situation is outlined in section 618 of the Code of Civil Procedure. It is therein provided that upon the polling of the jury that "if upon such inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, but if no such disagreement be expressed, the verdict is complete and the jury discharged from the case." It is clear, however, that nine jurors did not agree upon the verdict of thirty thousand dollars against the "Los Angeles Times." If at the time the verdict had been returned the jury had been advised of that fact and required to retire, they might have returned a verdict against the defendant corporation in which nine jurors concurred, but, as the record stands, we must conclude that nine jurors concurred in a verdict of only twenty-five thousand dollars against the "Los Angeles Times" and that the verdict for punitive damages failed because, so far as the record shows, some of those who voted for the five thousand dollar verdict as punitive damages might not have been willing to vote for a general verdict for as much as or more than twenty-five thousand dollars. The situation may be summed up thus: Nine jurors agreed that a libel had been committed upon the plaintiff and that he had been damaged thereby to the extent of twenty-five thousand dollars. Only seven of these nine jurors concurred in the conclusion that in addition to the compensatory damages the defendant corporation should be compelled to pay an additional amount by way of punishment. The three other jurors who were willing to agree to five thousand dollars as punitive damages, so far as the record discloses, did not concur in the amount of twenty-five thousand dollars compensatory damages and may have been unwilling to have re-

turned a verdict for more than five thousand dollars all told. In other words, although their verdict shows that they believed that there should be a five thousand dollar penalty imposed, this conclusion may have resulted from their belief that the actual damages suffered were very small and that a public example should be made of the defendant by the imposition of a penalty.

### Excessive Verdict.

[11] Appellants' next contention is that the verdict for compensatory damages is excessive and that for that reason the trial court should have granted a new trial. It is, of course, conceded that this court is powerless to interfere with the determination of the jury unless "there is reason to believe . . . that passion, prejudice, or sympathy has influenced the jury to give more than the facts reasonably warrant." (*Bond* v. *United Railroads of San Francisco,* 159 Cal. 270, [Ann. Cas. 1912C, 50, 48 L. R. A. (N. S.) 687, 113 Pac. 366]. See, also, *Aldrich* v. *Palmer,* 24 Cal. 513; *Wheaton* v. *North Beach & M. R. R. Co.,* 36 Cal. 590; *Wilson* v. *Fitch,* 41 Cal. 363; *Harris* v. *Zanone,* 93 Cal. 59, [28 Pac. 845]; *Howland* v. *Oakland Consol. Street Ry. Co.,* 110 Cal. 513, [42 Pac. 983]; *Dunn* v. *Hearst,* 139 Cal. 239, [73 Pac. 138]; *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.,* 156 Cal. 273, [104 Pac. 312]; *Hale* v. *San Bernardino etc. Co.,* 156 Cal. 713, [106 Pac. 83]; *Diller* v. *Northern California Power Co.,* 162 Cal. 531, [Ann. Cas. 1913D, 908, 123 Pac. 359]; *Meek* v. *Pacific Elec. Ry. Co.,* 175 Cal. 53, [164 Pac. 1117]; *Nolen* v. *F. O. Engstrum Co.,* 175 Cal. 464–467, [166 Pac. 346]; *Scott* v. *Times-Mirror Co.,* 181 Cal. 345, [12 A. L. R. 1007, 184 Pac. 672].) Appellants quote, as the only evidence upon which compensatory damages could be imposed, the following testimony of the plaintiff as to the effect of the libel upon himself: "It affected me and my feelings. It humiliated me. It disturbed my peace of mind, it disturbed my home, it made my wife very unhappy, it destroyed my sleep, and since its publication it has affected me. It has injured my reputation. It has discredited me with many people who read it, whom I have reasons to believe believed the accusations. . . . It is my belief and conviction that many people believed the article and believed I was dishonest and believed I had been purchased to defend criminals, and indirectly that I was a sodomite and a de-

generate.'' Appellants then argue that ''there does not seem to be any evidence that plaintiff suffered any serious pain, mortification, humiliation, or injury to his feelings. To say that one's 'peace of mind' and his 'home' are 'disturbed' and his sleep 'destroyed' is to employ terms more fitted to describe the effects of the usual spring housecleaning than to depict the results of a cataclysmic soul-quake.'' Appellants then proceed: ''There is left, then, for consideration the extent of plaintiff's injury due to his loss of reputation, and this also is to be determined from plaintiff's own testimony.'' Counsel then state: ''Assuming, then, the correctness of our position that the sole evidence of any importance before the court on the question of damages related to plaintiff's loss of reputation—and that the evidence of plaintiff himself—it must be plain, after even a casual consideration, that an award of twenty-five thousand dollars compensatory damages is not supported by the evidence, even if it be true, as stated in *Childers* v. *San Jose Mercury Printing & Pub. Co.*, 105 Cal. 284, 289, [45 Am. St. Rep. 40, 38 Pac. 903], that damages for loss of reputation 'may be recovered in the absence of actual proof; and to the amount that the jury estimates will fairly compensate plaintiff for the injury done.' ''

The respondent in his brief prints a summary of the evidence upon which he relied to sustain the verdict and we cannot better present his view than by quotations from his brief, as the facts are uncontroverted. ''The plaintiff was a man in the prime of life. He had lived in Los Angeles for twenty years. He entered the newspaper business early in 1901, nearly fourteen years before this . . . attack. . . . On July 14, 1911, . . . he commenced the publication of the 'Tribune,' a morning paper, sold for one cent. . . . He was, and for many years had been, engaged in many large and extensive business enterprises in Los Angeles, in Los Angeles County, and throughout the state, and was a particularly active and enterprising citizen of Los Angeles, the community in which he lived, having been, besides acquiring and conducting the far-flung business of publishing his two newspapers, a large and active investor in real estate, stocks, and bonds, and the erector and owner of several of the most important business blocks in Los Angeles, including the Central Building at Sixth and Main Streets, the Union Oil Building at

Seventh and Spring Streets, and Bullocks at Seventh and Broadway. In other words, he was a man of large affairs and many enterprises, the success or failure of which was dependent largely upon his personal character and his reputation for business integrity. Moreover, these various business interests naturally and necessarily made him widely known throughout the state, and caused him to be directly or indirectly connected with a vast number of people in a business way. Besides that, by reason of his widespread business activities, he, of course, had a wide circle of business acquaintances and friends, and his social circle must of necessity have been large. All of this was obviously true not only as to the place of his immediate residence and adjacent thereto, but throughout the state of California and elsewhere.

"He was also a man of family—a husband and father—the head of a household, the natural protector of a wife and four minor children, three boys and one girl, of whom he was doubtless the idol, and upon whom any breath against his reputation (as he conceived and believed) must have fallen like a blight. . . . It [the 'Times'] circulated far and wide in the community where the plaintiff and the plaintiff's family lived, where he had built up and was building up and carrying on his many splendid public-spirited enterprises, and where the larger number of his business friends and enemies lived, and where any stab at his reputation, either personally or in the matter of his business ventures, would sink most deeply. It [the 'Times'] also circulated largely throughout this, his native, state of California and elsewhere in the United States.

"At the time of the publication of the editorial which forms the basis of this suit [the 'Times'] . . . had a daily circulation of between sixty and seventy thousand a day—in other words, commanding a reading public of two or three hundred thousand.

"To this great reading public in this home of the plaintiff, and throughout the state of his nativity in which he had struggled to succeed and had succeeded, to his family—his wife, his boys and his girl just on the verge of young manhood and young womanhood—to his friends and to his business associates and business clientele, and (perhaps even worse) to his enemies and business antagonists (for every

red-blooded, successful business man, in this world where there obtains much malice, hatred, and all uncharitableness, has many enemies who would gloat over and use to his detriment every morsel of possible detraction, every hint of any step aside from rectitude), there went forth broadcast on this morning of December 3, 1914, thousands and tens of thousands of the defendants' great and widely influential newspaper; and on its editorial page, the very heart of this publication was the . . . attack upon plaintiff and upon plaintiff's newspapers—'The Defense of Degenerates.'

"In the homes of his fellow-citizens, upon the streets of his home city, with his subscribers everywhere, in the business houses of his advertisers, among the social friends of himself and his wife, with the schoolmates and companions of his children, all up and down the length and breadth of this great state, and even in widening circles all throughout this great country—his country—he was, by this article, branded in unmistakable terms as a defender of degenerates for hire, in the general business of taking money from such for the suppression of their malodorous practices . . . and as the *hired* protector of 'those who violate the laws of God and man,' as the degraded and degrading publisher of a 'Morning Sodomite' and an 'Evening Degenerate,' and . . . with countenancing and defending those unspeakable things and sheltering and protecting for a paid price those who indulged in them. . . . The success or failure of such enterprises depends absolutely upon the goodwill of the community in which the papers circulate, and the confidence of that community in such publication. Destroy that confidence, and you destroy the very foundation of their successful existence."

While we have quoted somewhat fully from the statement of facts and the argument of the respondent in favor of the verdict, we have omitted many considerations pressed in the respondent's brief in justification for the verdict. Sufficient has been said, however, to indicate that the article in question might have caused a very direct and serious pecuniary loss to the plaintiff growing out of the attack upon his reputation and character. Such attack would necessarily affect him in his business as a publisher, not only by destroying the influence of his newspapers, but also by affecting their circulation, and while no special damages were pleaded in

that regard and none are claimed, the respondent relying solely upon the injury to the plaintiff's feelings and to his reputation, enough has been said to indicate the extent of the plaintiff's reputation growing partly out of his publication of two daily newspapers and partly out of his business activities, to indicate that any impairment of his reputation for honesty or integrity would have a very serious effect upon him in his future business as a publisher of newspapers and as a man of large affairs in the business world. In measuring the effect of a libel upon an individual the jury is not confined to a consideration of the nature or purport of the words used, but is to consider also the effect upon the reputation of the plaintiff. It follows that even though smaller judgments for more opprobrious words have been sometimes held to be excessive, it may, nevertheless, be true that the reputation of a man widely known and who is seeking to maintain a reputation for public-spiritedness and broad-mindedness may be greatly damaged by words of much less serious import. A man of less extensive reputation may to some extent overcome the effects of a libel by moving from one location in a city to another or from one community to another, while the man who is well known throughout the entire city or community cannot escape the effects of a libel, even if he had the desire to move from one place to another for that purpose.

It is sufficient for us to state that in view of the uncontradicted facts we cannot say that the jury was influenced by either passion or prejudice in appraising the compensatory damages awarded the plaintiff, and that therefore we cannot interfere with their verdict.

The Cross-Complaints of the Times-Mirror Company and of H. G. Otis.

[12] Appellants claim that the court erred in sustaining the demurrer to the cross-complaints of the defendant corporation and of the defendant Otis for damages for libel alleged to have been published concerning them by the plaintiff, to wit, the publication of the cartoon entitled "The Brute," heretofore described.

The contention that the cross-complaint should have been allowed to stand seems to be met and disposed of by the decision of this court in *MacDougall* v. *Maguire,* 35 Cal. 274, [95 Am. Dec. 98]. In that case the defendant had com-

mitted a libel against the plaintiff and the next day the plaintiff committed an assault upon the defendant because of the libel. It is there held that these two torts were not a part of the same "transaction" within the meaning of the Practice Act, section 47, [Stats. 1851, p. 57], which is the same as the provisions of section 438 of the Code of Civil Procedure. The court there said: "The matter set up is clearly not a counterclaim, within the meaning of this provision (*Pattison* v. *Richards*, 22 Barb. 143; *Murden* v. *Pryment*, 1 Hilt. 76; *Barhyte* v. *Hughes*, 33 Barb. 320; *Schnaderbeck* v. *Worth*, 8 Abb. 38). . . . The party may have an independent cause of action, but it has no relation to the pending action." The court there quoted with approval from *Pattison* v. *Richards*, as follows: "The court said, 'If the defendant has a remedy against the plaintiff upon the matter set up, he must seek it in a separate suit.'" By parity of reasoning a cause of action for libel on one day could not be set up as a counterclaim to a cause of action for libel arising the next day, even though the second libel was the result of the first. They are separate and distinct transactions, and though connected in the sense that one is the result of the other, they are in contemplation of law entirely separate. Nor can it be said that the second libel "relates to the transaction" upon which the action is brought within the meaning of section 442, Code of Civil Procedure, authorizing the filing of a cross-complaint, "whenever the defendant seeks affirmative relief against any party, relating to or dependent upon the contract or transaction upon which the action is brought, . . . he may in addition to his answer, file at the same time, or by permission of court subsequently, a cross-complaint." Appellants, however, base their claim that the court erred upon section 438, defining a counterclaim, which contention, as we have shown, is disposed of in *MacDougall* v. *Maguire, supra.* We need not consider the question of whether a slander occurring in the course of the same conversation or assault or counter-assault in the same fistic encounter is a part of the same "transaction" within the meaning of section 438 of the Code of Civil Procedure. In such cases it has been held by some courts that a cross-complaint or counterclaim is permissible. (*Powell* v. *Powell*, 160 Wis. 504, [Ann. Cas. 1917D, 113, 152 N. W. 168]; 34 Cyc. 706, 710.) Appellants

suggest as a reason for allowing the counterclaim the desirability of settling the entire dispute between the parties in one action. We need not discuss the question of whether or not such a procedure would be desirable, as our decisions heretofore made have established a rule of action in this state under which the parties herein and the court below have proceeded. Furthermore, we have heretofore held that the mere desirability of settling all the disputes between the parties in one action is not a sufficient reason for permitting a cross-complaint or counterclaim to be filed. (*Meyer* v. *Quiggle,* 140 Cal. 495, 499, [74 Pac. 40], cited to the same effect in *Clark* v. *Kelley,* 163 Cal. 207, [124 Pac. 846].) If the rule is now to be changed, it should be done by the legislature and not by the court.

Is the Publication Complained of Libelous *Per Se?*

[13] In appellants' reply brief, filed nearly two and a half years after the transcript herein, the appellants for the first time claim that the complaint herein does not state a cause of action, for the reason that the alleged publication is not libelous *per se.* It is also claimed that even if the allegations of the complaint are sufficient to state a cause of action by reason of the innuendoes therein, that under the evidence showing the facts and circumstances of the publication it was error for the court to instruct the jury that the publication was libelous *per se.*

The contention of the appellants may best be stated in their own language as contained in their final brief, as follows: "(1) That mere vituperation does not constitute a libel. (2) That charging the doing of a lawful act is never a libel, no matter how opprobrious the epithets are by which the writer characterizes the acts. (3) That in determining the purport of the publication, the article must be read as a whole; its publication must be taken into consideration, so that words apparently actionable, may—in the light of the context and in view of the circumstances attending their publication—appear not to be actionable. (4) That when an article is mainly directed at one person or one proposition and harsh expressions are also applied hypothetically and by way of argument or incidentally to a second person the second person cannot maintain an action for libel based on the article, even though the expressions applied to him might be libelous if they stood alone. . . .

"And after analyzing the article sued upon, and applying the foregoing principles of law to it, appellants pointed out that it could be justly said that the language in the article here sued upon did not import anything of a defamatory character concerning the plaintiff; that the force of the article was directed against sodomites and degenerates, and the avowed policy of plaintiff and his newspapers that such persons should be shielded from publicity, which it had the legal right to adopt, and was not directed to plaintiff; that the defendant might have used daintier language but that mere vituperation does not constitute libel."

In support of these propositions the appellants have carefully and elaborately reviewed the cases, not only in this, but in many other jurisdictions, upon the subject. In view of the character of this publication and our own decisions upon the question of libel we believe it entirely unnecessary to review these authorities. It is perfectly manifest on the face of the article that it accuses the plaintiff of conduct so reprehensible that it must necessarily affect his standing in the community and expose him to obloquy and contempt. It thus comes clearly within the statutory definition of libel in this state, and, although it was said in *Schomberg* v. *Walker,* 132 Cal. 224, 226, 227, [64 Pac. 290], that the statutory definition of libel (Civ. Code, sec. 45) is a mere codification of the common-law definition, we deem it sufficient to point to the language of our statute and to call attention to our decisions upon similar contentions heretofore made without discussing these cases or quoting therefrom. The effect of the article, we think, is justly characterized by the respondent in the following paragraph which we take from his reply brief. While the statement in the brief is in the form of a question, we will omit the question: " . . . It had the strongest possible tendency to ruin the plaintiff's reputation personally by holding him out as the protector and champion of the lowest class of degenerates and the most disgusting types of degeneracy and to destroy his standing as a newspaper man by charging him with taking hire from those sodomites for defense." The respondent gives the following illustration to show the effect of the article, which we think is apt and therefore quote: "To illustrate: Suppose the plaintiff, as the proprietor of his two newspapers, had changed their names, the one to 'The Morning Sodom-

CLXXXV Cal.—13

ite' and the other to 'The Evening Degenerate,' and had advertised in their columns that it would thereafter be his policy in their publication and through them to 'coddle criminals,' 'to conceal their crimes,' to protect 'those who violate the laws of God and man' from punishment, and shelter them from publicity, and to defend for hire—for money—make a 'purchased defense' of—degenerates and the acts of evil-doers 'who are as lecherous as goats and as conscienceless as jackasses in April,' would such names for his papers, and such an announcement of his policies, have exposed him, as their proprietor and editor—the formulator of their policies—to hatred, contempt, ridicule, or obloquy, or have caused him to be shunned by his fellowmen, or have tended to injure him in his occupation as a newspaper publisher?" We think it is obvious that the foregoing question must be answered in the affirmative and that the article was libelous *per se;* that therefore the complaint states a cause of action and the court correctly instructed the jury. This view is in accord with our decisions on what renders an article libelous *per se* (*Bettner* v. *Holt,* 70 Cal. 270, [11 Pac. 713]; *Tonini* v. *Cevasco,* 114 Cal. 266, [46 Pac. 103]; *Schomberg* v. *Walker,* 132 Cal. 224, [64 Pac. 290]; *Adams* v. *Cameron,* 27 Cal. App. 625, [150 Pac. 1005, 151 Pac. 286]; *Fitch* v. *De Young,* 66 Cal. 339, [5 Pac. 364]).

As to the contention that the surrounding circumstances in evidence disprove the innuendoes in the complaint and show that the article was not libelous *per se,* it is only necessary to compare the plaintiff's statement of his purposes in refraining from the publication of such incidents as the Long Beach scandal with the purposes of the plaintiff as stated by the defendant in the article complained of to show that the latter article in effect charged plaintiff with rank hypocrisy, and such a charge has been held libelous *per se.* In *Newby* v. *Times-Mirror Co.,* 173 Cal. 387, [Ann. Cas. 1917E, 186, 160 Pac. 233], it is said: "It is libelous *per se* to falsely charge that a person is a hypocrite." Defendants' statement concerning plaintiff's purpose in suppressing such "news" in the article complained of has already been stated herein. The plaintiff's statement of his purpose is of a directly opposite character and is contained in an editorial from the "Tribune," published November 19, 1914, which we quote, as follows:

"JOURNALISM THAT IS SO BRUTAL THAT IT KILLS.

"Brutal journalism sometimes becomes homicidal journalism. Several instances are supplied by the recent record of local events. Driven to desperation because they were made the victims of sensational publicity, men have sought refuge in death from the attacks that were made upon them. They preferred to meet the instant judgment of God rather than face the merciless clamor of men.

"It is the business of newspapers to print the news, but that duty should be performed in decency and with discrimination. No man is so well fortified in the respect and regard of the community, by even a lifetime of good conduct, as to be immune against causeless attack. It is within the power of any abnormal person actuated by malice, moved by blackmail or stirred merely by a love of sensationalism, to bring accusations of a frightful character. Such charges ought not to be given publicity until proof of their truth formally has been adduced. Otherwise an irreparable injury is inflicted even upon the wholly guiltless.

"No interest of society is subserved by the premature exploitation of such accusations. The public will be as well protected against the offender if publicity is withheld until conviction shall have been secured. The adoption of such a policy would spare the victims of false witness the frightful shame and unendurable disgrace that now so often permanently attaches itself to the accused even when acquitted. Sometimes it happens that men of high spirit and extreme sensitiveness, unable to endure the reflection that they have been held up to public scorn, take their lives rather than to face, even though innocent, the biting contempt of a censorious world too prone to give prejudgment on insufficient evidence.

"It should not only be the policy of decent newspapers to withhold publication of charges affecting honor and character until there shall have been a legal adjudication of guilt or innocence, but public officials themselves should exercise a superior discretion in dealing with cases of this nature. Morbidity that finds gratification in publicity, abnormal natures that are in fact affected with psychic disturbances, blackmailers ever seeking to find victims—all these go in endless procession to the offices of public officials with tales and accusations that ought not to be the

basis of public official action except after the most rigid and exacting inquiry.

"The character of an honorable man is dearer to him than his physical life. His good name is esteemed by him as is his most precious possession, and accusations of infamy, supported by official proceedings based thereon, and reinforced by the publicity given by a sensational newspaper, inflict a strain that never can be eradicated. The world should act upon the principle that the accused is innocent until he is proved guilty.

"Let us have an end of the wicked, cruel system that now obtains and begin here a reformation that will reach in its influence to the uttermost extent of the Union. Guilt must be punished! True, but punishment of the guilty is not endangered by withholding publicity until proof makes it certain that innocence takes no injury."

Again, in an editorial in the "Tribune" of November 22, 1914, it is stated: "The 'Tribune' and the 'Express' do not believe that there is any 'scoop' in printing scandalous stories which frequently are untrue, or founded on blackmail, the publication of which will serve no good purpose and the only result of which will be to harm and injure the individual. The 'Tribune' and 'Express' do not believe that the public ever want to read this sort of stuff, and are resolved, even if there is a demand for this class of matter existing in a few depraved minds, that those persons will have to look elsewhere for the filth they seek. It long has been the custom of the 'Tribune' and the 'Express' to throw such matter in the waste-basket."

We therefore think that the surrounding circumstances of the publication accentuate its libelous character rather than diminish the effect imputed thereto in the complaint.

[14] It is also contended by the appellants that in view of the fact that the respondent was a publisher of two daily newspapers, and therefore in a sense a public character, they were entitled to discuss his character with more freedom than they would a more private individual. The fact that a man is the publisher of a newspaper does not justify libelous attacks on him on the theory that he is a public character. If the fact that he is a publisher in any way reduces the damage he actually suffers by the publication, it can be considered by the jury in appraising his damages.

That the publication of a newspaper by the plaintiff, as a matter of law affects either the liability of the defendants to respond in damages, or the right of the plaintiff to recover for a publication which would be considered libelous as to any other person, is a proposition that cannot be successfully maintained. The decision in the case of *Newby* v. *Times-Mirror Co.*, 173 Cal. 387, [Ann. Cas. 1917E, 186, 160 Pac. 233], supports this conclusion. It is there stated: "The duty of a newspaper to the public does not justify the publication of false and defamatory matter concerning a private citizen merely because he is active in promoting his own political views."

The trial court is directed to reduce the judgment to twenty-five thousand dollars against all the defendants, and as so modified the judgment is affirmed.

Lennon, J., and Sloane, J., concurred.

ANGELLOTTI, C. J., Concurring.—I concur in the judgment and in the foregoing opinion.

On the question of the reduction of the judgment to twenty-five thousand dollars it is perfectly clear that nine jurors did not agree upon a *total award* of more than twenty-five thousand dollars, and without such concurrence I do not see how judgment for a larger amount can be sustained. There seems to me to be no authority for the practice followed in this case of allowing the jury to render *separate and distinct* verdicts upon the questions of compensatory and punitive damages, or, at any rate, in regarding for the purposes of judgment each of such verdicts as a separate and distinct verdict. Whatever may be the special issues submitted to a jury in a case of this character, there can be but a single award, and this single award must be concurred in by three-fourths of the jury. Of course, there is no objection to a jury finding a verdict for, say thirty thousand dollars, stating in its verdict that twenty-five thousand dollars thereof is for compensatory damages and five thousand dollars for punitive damages, but in such a case it is essential that three-fourths of the jury shall concur in the total award of thirty thousand dollars. Otherwise we have a judgment against a defendant for a larger sum than three-fourths of the jury have agreed on. In this case the

concurrence of every one of the nine jurors who declared for twenty-five thousand dollars compensatory damages was essential to the award of the additional five thousand dollars included in the judgment, for without this there could be no concurrence of three-fourths of the jury in the total award against the defendant. Under the practice followed in the trial court the concurrence of only six of the jurors who agreed on the twenty-five thousand dollar award for compensatory damages would be essential to the award of an additional five thousand dollars punitive damages, provided the three who did not concur in the twenty-five thousand dollar award were willing to agree on a five thousand dollar award of punitive damages. In such a case we would have an award for a total sum concurred in by only one-half of the jury. In this case, as appears in the main opinion, only seven of the jurors concurred in both of the awards.

OLNEY, J., Dissenting.—I concur with Judge Wilbur except in his conclusion that because the same nine jurors who agreed upon the verdict of twenty-five thousand dollars for compensatory damages did not also agree upon the verdict of five thousand dollars for punitive damages, the latter verdict cannot stand. With that I cannot agree. The two verdicts are separate and each is supported by the requisite number of jurors, and that would seem to be enough.

Judge Wilbur's reasoning, as I understand it, proceeds upon the proposition that "so far as the judgment is concerned and the collection thereof it is utterly immaterial whether the damages are classified as punitive or compensatory. They constitute the amount of the award made by the court in favor of the plaintiff." With this proposition as the basis, he then reaches the conclusion that there was but one verdict for thirty thousand dollars, and that nine jurors are not shown to have concurred in this verdict. If this reasoning be true, it would certainly seem to mean that the verdict for twenty-five thousand dollars compensatory damages must fall as well as the verdict for five thousand dollars punitive damages. The reasoning whereby he holds that the verdict for five thousand dollars punitive damages cannot stand can be applied with equal force to the verdict

for compensatory damages. If there is but one verdict, then it is for thirty thousand dollars, and nine jurors have not concurred in it. Why it should be void as to one element and not as to the other, I do not see.

The fallacy in the reasoning seems to me to consist in the assumption that there was in reality but one verdict. There was not one verdict, but there were two. The statement that *"so far as the judgment is concerned and the collection thereof* it is utterly immaterial whether the damages are classified as punitive or compensatory. They constitute the amount of the award made by the court in favor of plaintiff," is, of course, true, but we are not dealing here either with the judgment or its collection. We are dealing with the matter of rendering a verdict, and certainly two verdicts were rendered, as the opinion itself states, and each upon a separate and distinct issue, and each supported by the requisite number of jurors. Furthermore, there is no inconsistency between the verdicts. Each verdict implies that the defendant is liable for a libel. Upon the issue as to the amount of actual damages, nine jurors believed that such damages in the amount of twenty-five thousand dollars had been suffered, and so found. On the other hand, on the issue as to punitive damages, nine jurors likewise believed that the libel was malicious and that the proper amount to be allowed because of this element was five thousand dollars, and so found. Two or three of the jurors who had concurred in the verdict fixing the amount of compensatory damages did not agree with this, either because they did not believe the libel was malicious or because they did not agree with the amount fixed as punitive damages. The point of the matter is that there were two verdicts, not one; that all the jurors who concurred in either verdict agreed that the defendant was liable for a libel; that they disagreed only upon the separate and distinct issues as to the amount of damages actually suffered, and the amount of punitive damages, if any, which should be assessed; that upon each of these distinct issues a verdict supported by nine jurors as required by law was returned, and that the vote of no juror upon either of these verdicts was inconsistent with his vote upon the other. The case is nothing more than one wherein what were really special verdicts were asked upon distinct and separate ele-

ments of damage, and such verdicts were returned. Upon their being returned, the court took the assessments so arrived at of the two elements of damage, added them together· to obtain the total amount for which the defendant was liable, and gave judgment accordingly. This would seem to be exactly what the code provides may be done. (Code Civ. Proc., secs. 624, 625.)

Shaw, J., and Lawlor, J., concurred.