75 Cal.Rptr.3d 61 (2008)
161 Cal.App.4th 848
Theresa KEENER et al., Plaintiffs and Respondents,
v.
JELD-WEN, INC. et al., Defendants and Appellants.
No. D049471.
Court of Appeal of California, Fourth District, Division One.
April 2, 2008.
*64 McAtee Harmeyer, Jeff G. Harmeyer and Greg A. McAtee, San Diego, for Defendants and Appellants.
Reed Smith, Paul D. Fogel, Dennis Peter Maio, San Francisco; The Zucker Law Firm, Andrew J. Zucker, Riverside; The Basile Law Firm and Jude Basile for Plaintiffs and Respondents.
Certified for Partial Publication.[*]
HUFFMAN, Acting P.J.
In this wrongful death action arising from a motorcycle and truck collision, the surviving plaintiff Keener family sued the other driver involved in the accident and his employer (respectively, defendants and appellants Hector Solis and Jeld-Wen, Inc., dba Summit Window and Patio Door ("Jeld-Wen"; sometimes collectively defendants).[1] After a three-week jury trial, plaintiffs prevailed, obtaining a damages award against defendants of $3,952,000 (representing an 80 percent fault allocation to defendants pursuant to a special verdict in nine parts that answered 16 specific questions). An extensive new trial motion was denied, judgment was entered, and defendants appeal. (Code Civ. Proc., § 657; all further statutory references are to the Code of Civil Procedure unless otherwise noted.)
Defendants chiefly argue that prejudicial error occurred when the verdict was taken, polling was conducted, and certain crucial questions and answers were omitted, resulting in a special verdict that was fatally defective for lack of sufficient votes to support the jury's conclusions on the 80/20 percent apportionment of fault (special verdict no. 9). Defendants also contend the trial court incorrectly allowed plaintiffs' counsel to make numerous prejudicial references in argument to Jeld-Wen's status as the employer of the driver Solis, even though only the conduct of Solis was at issue. Defendants base the latter argument upon their interpretation of this court's prior opinion issued in this same matter, Jeld-Wen Inc. v. Superior Court, (2005) 131 Cal.App.4th 853, 32 Cal. Rptr.3d 351 (Jeld-Wen) (our prior opinion). There, we upheld Jeld-Wen's challenges to a summary adjudication ruling regarding the effect of an admission by Jeld-Wen, as an employer, of vicarious liability for the acts of its employee, Solis. At trial in the present proceeding, the court implemented that decision through an in limine ruling that restricted the type of references to the role of Jeld-Wen, as the employer, that could be brought before the jury in attempting to prove Solis was driving negligently at the time of the accident; however, defendants contend the trial *65 court did not go far enough in its ruling and prejudicial argument and innuendo the company itself was at fault were the results. Defendants further argue there were several prejudicial instructional errors, and prejudicial jury misconduct occurred in several respects.
In resolving the arguments on appeal, we first address the proper scope of the direction given by the prior opinion in this case, regarding the role of Jeld-Wen at trial during the presentation of evidence and argument. We then turn to defendants' challenges to the validity of the special verdict regarding the apportionment of liability, and will explain that the verdict was incomplete, requiring us to reverse the judgment and remand for a limited new trial on the sole issue of apportionment of fault. For the guidance of the trial court, we also resolve the current claims of instructional error and alleged jury misconduct, and have found that no prejudicial error occurred, such that the remaining eight special verdicts are well supported by the record, and the new trial must go forward from that point.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. Accident and Filing of Action
The plaintiffs' husband and father E. Scott Keener (referred to here as Keener or decedent), was a longtime motorcycle rider. On July 19, 2002, he was 47 years old, weighed about 210 lbs., and worked as a project manager at a construction firm. He went to work in the morning and then, with a coworker, to a late lunch that included two cocktails. About two hours later, about 4:00 pm, he left for home on his motorcycle and approached the intersection of Winchester Road (the same as State Highway 79, running north-south, with a speed limit of 65 miles per hour) and Willows Road, which ran east-west and had stop signs at the highway.
At that time, Jeld-Wen's employee, Solis, was driving a company-leased 34-foot truck, carrying out his duties of delivering windows to residential construction development projects. Solis, who had only a third grade education and spoke mainly Spanish, held a driver's license which enabled him to legally drive this type of truck, and he had also driven one for a previous employer. He often drove pickup trucks for Jeld-Wen, but had been driving this larger type of truck off and on for a period of approximately six months. He had been working since 6:00 a.m. that day and recently had been working over 10 hours a day.
That day, Solis drove up to and stopped at the stop sign at this intersection. As Keener rounded a curve, going toward the intersection, Solis pulled out to make a left turn onto one of the three southbound lanes of Winchester Road. Accident reconstructionists later concluded that Keener was driving about 65-70 miles per hour and would have seen the truck turning between 465-600 feet or about five or six seconds away. One or two seconds before impact, he braked but collided with the truck and died at the scene. A witness to the crash talked to Solis at the scene and said he seemed to be very remorseful and might have said in Spanish that he did not see the motorcycle, although the witness was not sure he understood what Solis was saying.
Plaintiffs filed a wrongful death complaint which encompassed three theories of liability against defendants: negligence, negligence per se, and negligent entrustment *66 of a vehicle. Numerous motion proceedings were held, culminating in the issuance of our prior opinion, in which we analyzed the differences among these various theories of liability with respect to the various defendants, including the lessor of the truck, the employer, and the employee, and also with regard to evidentiary considerations arising from those employment relationships.
During discovery, plaintiffs learned that in addition to the large truck involved in the incident, Solis usually drove pickup trucks for Summit, and while doing so, he had had three property damage collisions on the job in 1998, 2000, and 2002 (two in parking lots and once on the freeway). There was no evidence produced indicating that Solis was incompetent, ill, or otherwise unfit to drive the truck on the date of the incident, and the results of a blood test taken immediately after the accident showed no alcohol or drugs in Solis's system at the time. Blood tests of the decedent showed that he had approximately .03 percent alcohol level in his blood, as well as traces of Valium and its metabolic byproducts at therapeutic levels.
After the accident, plaintiffs allowed the motorcycle to be disassembled before it could be inspected by defendants, and also destroyed the substandard leather helmet that decedent was wearing at the time of the accident. Before trial, the court issued evidentiary and issue sanctions that precluded plaintiffs from introducing any expert or other evidence based upon the examination and inspection of the motorcycle before it was disassembled. Plaintiffs were also ordered not to oppose any claims or defenses by defendant "regarding the decedent's use of an illegal non-DOT approved helmet."

B. Prior Opinion
In the prior opinion, as briefly summarized here, we explained-that defendant Jeld-Wen, as an employer, had made a binding pretrial admission that Solis, its employee, was acting in the course and scope of his employment at the time of the accident, which had the effect of an admission to vicarious liability under the doctrine of respondeat superior for any alleged and proven employee negligence. Under those circumstances, the negligent entrustment theory against Jeld-Wen was deemed to be essentially superfluous to the basic cause of action for damages for negligence, and we decided that it could not be separately pursued at trial by plaintiffs. We reached those conclusions under the authority of Armenia v. Churchill (1954) 42 Cal.2d 448, 457-458, 267 P.2d 303 (Armenta), and we reasoned that the requirements of Evidence Code section 1104 must be applied to avoid prejudicial evidentiary problems that might otherwise arise about admissibility of evidence of the employee's prior motor vehicle accidents, as known to the employer (even though the same evidence would ordinarily not be admissible to prove such negligence on a particular occasion). (See part I, post.)
Following the return of the remittitur, the trial court entered an order granting summary adjudication on the negligent entrustment theory, as directed. Before trial, plaintiffs dismissed the action as to the truck leasing company and three public entities involved in designing or maintaining the roadways.

C. Jury Trial; Special Verdicts; Polling Procedure
Numerous in limine motions brought by each side were resolved at the outset of trial. Defendants' first request was that pursuant to the authority of our prior opinion, plaintiffs should be precluded from making any references to Jeld-Wen's status as a party defendant in the action, on *67 the ground that the jury would not be required to make any factual findings about Jeld-Wen, but only about the actions of its employee, Solis. Plaintiffs opposed the motion, contending that any identification of Jeld-Wen as the employer would not amount to "evidence." The trial court denied the motion, stating that plaintiffs would be allowed to tell the jury that Solis was employed by Jeld-Wen at the time of the accident, and afterward. However, during trial, the trial court ordered that the special verdict should not require any findings about any negligence of Jeld-Wen, but only of Solis.
After the jury was seated, the trial court gave it standard preinstructions, including a statement that a corporation was a party to the lawsuit, and was entitled to the same fair and impartial treatment to which an individual or person would be entitled. The jury was told not to consider whether any of the parties was insured, and that the case must be decided based only on the law and the evidence.
Extensive trial testimony was presented from witnesses to the collision, including Solis.[3] Each side brought in expert evidence from accident reconstructionists, who reached opposite conclusions about whether decedent could have avoided the collision in the seconds before it happened. Testimony from an expert in motorcycle riding' was presented by defendants to show the requirements for safe operation of a motorcycle.
Each side brought in its own expert in toxicology or psychology, regarding the evidence and significance of blood alcohol and the presence of Valium in the decedent's blood after the accident. They also reached opposite conclusions, to be described in part III, post. Plaintiffs' offer to compromise was rejected. (§ 998.)
The trial court heard extensive argument about jury instructions, and denied the request by defendants to give an instruction about the effect of driving while impaired by drugs and alcohol, as applied to the decedent. (Evid.Code, § 669.) The court found that the evidence presented about impairment of driving ability was too speculative to justify such a negligence per se instruction. The court also refused to give defendants' proposed instruction that motorcycle riding is an extremely dangerous activity that requires the exercise of extreme caution, which defendants claimed was justified based upon statistics they submitted, for judicial notice, about the high accident rate for motorcyclists (27 or more times more likely to die than an automobile driver in a collision).
After 10 days of testimony, the jury was instructed and deliberated for more than two days. The jury brought in its 16-question special verdict, in nine parts, which was dated and signed by the foreperson (Raul Santana), who told the court it was their verdict. This document was read into the record by the clerk, and it found that both Solis and the decedent were negligent, and their negligence was each a substantial factor in causing the death. Dollar amounts of past and future economic damages, and noneconomic damages, were awarded to the three' plaintiffs separately. The ninth special verdict found that Solis was 80 percent responsible for the death, and decedent was 20 percent responsible.
The trial court then told counsel that it was its standard practice to poll the jury, and it proceeded to do so. We will explain in part II, post, that of the 192 potential *68 questions in the verdict to the jurors, two were inadvertently omitted, one regarding the apportionment of fault, and we will discuss the effect of that omission upon the validity of the jury's conclusions. In any case, the jury was then discharged. The court asked counsel if there was anything further, and they both said no.
Two days later, the trial court somehow became aware that two of the special verdict questions had been omitted as to Juror No. 7, Patrick Brown, regarding whether decedent's negligence was a substantial factor in his death, and the percentage of comparative fault finding. The court notified the parties and took briefing on the matter, and ultimately denied defendants' motion to invalidate the verdict, finding any such claims had been waived. (These proceedings will be described in greater detail in pt. II, post.)[4] Judgment was entered in the total amount of $3,952,000, pending a determination of costs and prejudgment interest.

D. New Trial Motion; Denial; Appeal
Defendants next brought a new trial motion, arguing that the comparative fault verdict was constitutionally invalid, because the polling was incomplete and there were insufficient votes orally recorded (eight) to uphold the written verdict's 80/20 comparative fault determination. The foreperson, Juror No. 10, Raul Santana, had stated at polling that his apportionment vote was 50/50. Defendants also sought a new trial on the ground that the jury committed misconduct by discussing, during their damages deliberations, whether they could allow extra money for an attorney fees award. Defendant also argued Juror No. 12, Lori Whalen, had concealed potential bias, because it was learned that she told the foreman after trial that her close friend's husband was an attorney, who attended trial a few days, and the friend sat on the same side as plaintiffs' trial counsel in the courtroom. Other grounds of error argued included instructional problems, the denial of the motion in limine to preclude any mention of Jeld-Wen as a defendant during trial, and other claims. Juror declarations from Foreman Santana and Juror Rae Woods were submitted by defendants, giving details of the deliberations, voting, and polling.
Extensive opposition was filed by plaintiffs, including four juror declarations that contradicted those submitted by defendants on various topics, to be described later. After a hearing, the trial court issued a written ruling denying the new trial motion, again finding that any defense claims based on an inadequate verdict had been waived (similar to the earlier decision on the motion to invalidate the verdict). Judgment was completed, modified, and entered, and defendants appeal.

DISCUSSION
We first address the scope of the directions given by the prior opinion in this case regarding the proper role at jury trial of Jeld-Wen, the employer of Solis, since Jeld-Wen had admitted to vicarious liability *69 for his acts, if those were found to be negligent as of the time of the fatal accident. Once we address defendants' claim that prejudicial argument and references about Jeld-Wen's participation at trial were erroneously allowed to take place, we may turn to the questions about the validity of the special verdict regarding the apportionment of liability and the denial of new trial on that basis. Finally, we will discuss the claims of instructional error and alleged jury misconduct. The applicable standards of review will be separately stated with each topic.

I

PRIOR OPINION INTERPRETATION
At the outset of trial, the court resolved numerous motions in limine brought by each side. In defendants' first such motion, they sought a ruling to preclude any mention at trial of Jeld-Wen as a defendant in the action. They argued that the result of the prior opinion was to remove any factual issues from the jury regarding Jeld-Wen, since it had admitted before trial to vicarious liability, in the event that Solis was found to be negligent.
On appeal, they challenge this ruling in limine and question various discretionary rulings throughout trial as the issue came up, with regard to the proper scope of evidence and argument. The same arguments were also a basis of their unsuccessful motion for new trial. We evaluate all these claims in terms of the trial court's exercise of discretion in applying the guidance given by the prior opinion in admitting evidence and allowing argument about the evidence. "`Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. [Citations.] Speaking more particularly, it examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question. [Citations.] That is because it so examines the underlying determination as to relevance itself. [Citations.] Evidence is relevant if it has any tendency in reason to prove a disputed material fact. [Citation.]'" (City of Ripon v. Sweetin (2002) 100 Cal.App.4th 887, 900-901, 122 Cal.Rptr.2d 802; People v. Waidla (2000) 22 Cal.4th 690, 717-718, 94 Cal.Rptr.2d 396, 996 P.2d 46.)
Defendants now argue they incurred prejudice from such events as, for example, the trial court's implied permission to plaintiffs to refer to Solis in a plural sense, such as "they and them," in terms of the vigorousness of the defense being conducted, and the failure to settle the case before trial, which the jury could have understood to be evidence of culpable activities of the employer, rather than negligence of the employee. A prejudice standard applies to this civil matter: "`No form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where in light of the entire record, there was no actual prejudice to the appealing party.'" (Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 580, 34 Cal.Rptr.2d 607, 882 P.2d 298, cited in Cassim v. Allstate Ins. Co. (2004) 33 Cal.4th 780, 801, 16 Cal.Rptr.3d 374, 94 P.3d 513 (Cassim).) "Accordingly, errors in civil trials require that we examine `each individual case to determine whether prejudice actually occurred in light of the entire record.'" (Id. at pp. 801-802, 16 Cal. Rptr.3d 374, 94 P.3d 513.)
In the prior opinion issued in 2005, we were concerned with the proper legal effect of a pretrial admission by an employer that its employee was acting in the course and scope of his employment at the time of an accident, where negligence is alleged. Such a move by the employer amounted to an admission of its vicarious liability under *70 the doctrine of respondeat superior for any such alleged employee negligence. (Armenia, supra, 42 Cal.2d 448, 457-458, 267 P.2d 303.) We relied on Armenta's discussion and facts to conclude that when an employer defendant admits to vicarious liability as the principal for alleged tort liability of an employee, "`the legal issue of [the employer's] liability for the alleged tort was thereby removed from the case....'" (Jeld-Wen, supra, 131 Cal.App.4th at p. 866, 32 Cal.Rptr.3d 351, citing Armenia, supra, 42 Cal.2d at p. 458, 267 P.2d 303; italics added.)
We accordingly issued our decision that, based upon its pretrial and binding admission to vicarious liability for negligence, if any, defendant Jeld-Wen was entitled to summary adjudication in its favor on a negligent entrustment theory, since that admission essentially disposed of the basic cause of action for damages for negligence as to the employer only. We agreed with defendants that this approach was justified by Armenta, supra, 42 Cal.2d 448, 267 P.2d 303, and was necessary "to avoid prejudicial evidentiary problems that would otherwise arise about admissibility of evidence of the employee's prior motor vehicle accidents, as known to the employer (even though the same evidence would ordinarily not be admissible to prove such negligence on a particular occasion under Evidence Code section 1104)." (Jeld-Wen, supra, 131 Cal.App.4th 853, 858, 32 Cal. Rptr.3d 351.) We granted the defense petition for writ of mandate "to require the trial court to vacate its order denying the summary adjudication motion as to the employer and to grant it as to the employer only." (Ibid.) At that point, it remained for trial whether the plaintiffs would be able to prove that the employee, Solis, was in fact negligent at the given time. We explained the rationale for this decision:
"Once the employer admittedly becomes vicariously liable for the negligent acts of the employee, there is no remaining basis at a future trial to attempt to prove the negligence of the employer itself, such as through knowledge of the employee's prior accidents, because the subject liability `has already been adequately and completely established. This represents an effort to promote judicial economy by avoiding unnecessary litigation. It also represents an effort to ensure that prejudicial evidence on negligence is kept out pursuant to the principles of Evidence Code section 1104, because the existence of negligence on a particular occasion should be determined from the nature of the subject act or omission, `not by defendant's character for care [or lack thereof].... [Citation.]' [Citation.]" (Jeld-Wen, supra, 131 Cal.App.4th 853, 866-867, 32 Cal.Rptr.3d 351; italics added.)
Defendants seize upon the above language and also the following passage from our prior opinion, to argue that the case was essentially over as to Jeld-Wen before trial, so that it was entitled to be completely anonymous or invisible at trial: "For our purposes here, the employer's pretrial admission of liability for the employee's conduct is sufficiently binding to allow us to treat this as a question of law .... Moreover, even though proof remains to be made regarding whether the employee was actually negligent during the accident in question, there has been no showing on this record that the employer's admission of vicarious liability is not sufficiently final to dispose of the respondeat superior question as a matter of law." (Jeld-Wen, supra, 131 Cal.App.4th at pp. 864-865, 32 Cal.Rptr.3d 351; italics added.)
Defendants construe our prior opinion too narrowly and selectively. Our discussion of the issues of law presented was not intended to and does not support *71 any conclusion that Jeld-Wen would have no appropriate role whatsoever at the trial. Instead, our decision was directed toward clarifying the difference among the various theories pled and their effect upon the evidentiary issues that would inevitably arise. As explained in Armenia, supra, 42 Cal.2d 448, 267 P.2d 303, an admission of vicarious liability by an employer places the employer in the position of the principal for any tort liability founded upon the negligent acts of the employee. (Id. at p. 457, 267 P.2d 303.)' The employer is then subject to the same legal liability as might be imposed upon the employee, in the event the employee is liable for negligence. (Ibid.)
The circumstances of this case required that the factfinder understand that at all relevant times, Solis was on duty, acting in the course and scope of his employment while driving the truck. The jury was properly told of the facts of his employment, from 1997 to and including the time of trial, and that the employer routinely told Solis which truck to drive and when.
However, plaintiffs also brought out the fact that defendants had hired experts to go out to the scene of the accident with Solis and inspect it. Throughout trial, plaintiffs counsel made constant references to "the defendants" as plural, such as stating that "they" blame decedent, drugs, or alcohol for the accident, and "they" refuse to accept any responsibility for "this thing," and plaintiffs' attorney told the jury he thought Solis personally would have liked to admit liability, so it was questionable "where is this defense coming from."
Defendants now argue that the cumulative effect of all of these references to the employer was an improper focus upon the employer-defendant, to expand the issues beyond the employment status as it affected potential liability that might arise from Solis's exercise of care (or lack thereof) in the driving that led up to the accident. Defendants contend that the jury might accordingly have been led to view Jeld-Wen as equivalent to an insurer for Solis, or merely a deep pocket, and to ignore the evidence on the negligence issues. These concerns are not well founded. It would be a fiction to disregard the fact that Solis was not driving his own truck on his own business, and the jury was not required to do so. The jury was told that arguments of counsel were not evidence, and that the case should be resolved on the evidence presented, such as how the accident occurred. (Evid.Code, §§ 210, 350.) This was consistent with the approach outlined in Armenia, supra, 42 Cal.2d 448, 267 P.2d 303, in which the employer may be placed in the position of the principal for any negligence liability proven to exist on the part of its agent or employee. (Id at p. 457, 267 P.2d 303.) Even though the jury was not required to make any findings on any respondeat superior liability, since that was a question of law, the jury was entitled to know that Solis was an employee of Jeld-Wen at the time of the accident.
We are nevertheless concerned that some of the plaintiffs' attorneys' references in argument were at the outer limit of the permissible interpretation of the prior opinion, with regard to "where that defense was coming from," but such comments as a whole also can be viewed as referring collectively to the defense team, possibly including defense counsel as well as Solis and his known employer. In any case, the instructions and the special verdict form questions did not reference the conduct of Jeld-Wen, but instead framed the issues as whether Solis was negligent, in light of the evidence presented. The juror declarations filed in connection with the new trial motion were conflicting about whether the jury members speculated *72 about whether Jeld-Wen, as opposed to Solis, would be paying the judgment, if any, but this evidence is inconclusive even if it can be properly considered. (Evid. Code, § 1150).
We may also take into account the trial court's preinstruction to the jury about the right of a corporate defendant to be treated as fairly as an individual. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] `and that its verdict reflects the legal limitations those instructions imposed' [citation]." (Cassim, supra, 33 Cal.4th 780, 803, 16 Cal.Rptr.3d 374, 94 P.3d 513.) The trial court correctly denied defendants' motion in limine to preclude any mention of the employer, and it fashioned the special verdict form appropriately. Even assuming that some of the plaintiffs' arguments and insinuations went beyond what would be a correct application of the principles set forth in our prior opinion, any error was harmless, because the jury was entitled to know that the case was not yet over for the employer as of the time of trial, and appropriate cautions were made to the jury on that issue.

II

CHALLENGES TO JURY VERDICT, JUDGMENT AND NEW TRIAL DENIAL: APPORTIONMENT OF FAULT
Defendants next argue they are entitled to a new trial, or partial new trial, due to "polling error" and a fatally inadequate verdict on a crucial issue. (§ 657, subd. 6 [the verdict is against law]; subd. 7 ["error in law, occurring at the trial and excepted to by the party making the application"].) In reviewing the denial of a new trial motion, we initially apply the standards set out in City of Los Angeles v. Decker (1977) 18 Cal.3d 860, 871-872, 135 Cal.Rptr. 647, 558 P.2d 545:
"[A] trial judge is accorded a wide discretion in ruling on a motion for new trial and ... the exercise of this discretion is given great deference on appeal. [Citations.] However, we are also mindful of the rule that on an appeal from the judgment it is our duty to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the rights of a party [citation], including an order denying a new trial. In our review of such order denying a new trial, as distinguished from an order granting a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial. [Citations.]" (Italics in original.)
"Prejudice is required: `[T]he trial court is bound by the rule of California Constitution, article VI, section 13, that prejudicial error is the basis for a new trial, and there is no discretion to grant a new trial for harmless error.' [Citation.]" (Sherman v. Kinetic Concepts, Inc. (1998) 67 Cal. App.4th 1152, 1160-1161, 79 Cal.Rptr.2d 641.)
In addition to applying the above abuse of discretion standard on appeal, we must resolve questions of law about the validity of the special verdict on the apportionment of liability. The trial court drew legal conclusions from the evidence provided about the polling process, in the course of interpreting the special verdict, and our review of such legal rulings is conducted on a de novo basis. (Ghirardo v. Antonioli (1994) 8 Cal.4th 791, 799-801, 35 Cal. Rptr.2d 418, 883 P.2d 960.)
Defendants first contend the record does not support a conclusion there were actually nine votes on the 80/20 percent apportionment of liability verdict, such *73 that the verdict is inadequate or unconstitutional as a matter of law. (Cal. Const., art. I, § 16; § 618.) They next argue that such a defect cannot be waived, or that even if that defect could qualify for a waiver doctrine, waiver of error should not be applicable here, because this was not an "apparent" defect at the time of the jury polling in this case. (Henrioulle v. Marin Ventures, Inc. (1978) 20 Cal.3d 512, 521, 143 Cal.Rptr. 247, 573 P.2d 465 (Henrioulle).) Defendants admit the proper scope of any grant of new trial would be a close question, and they appear to concede that either a complete new trial or a proceeding limited to the apportionment of fault issue would be appropriate.
In reply, plaintiffs interpret the record as showing there must have been a ninth vote on apportionment in the jury room, according to the weight of the jury declarations, and even if there was not, there was a lack of disagreement in open court within the meaning of section 618, sufficient to show any problem with the verdict. Plaintiffs contend defendants waived any right to demand an adequate verdict, by not objecting at trial. We discuss these issues separately, after first setting forth basic criteria for taking and accepting civil jury verdicts.

1. Applicable Standards; Nine Vote Requirement
In Resch v. Volkswagen of America, Inc. (1984) 36 Cal.3d 676, 678-679, 205 Cal. Rptr. 827, 685 P.2d 1178, the Supreme Court relied on the state Constitution and statutes as providing that in civil cases, three-fourths of the jury may render a verdict. (Cal. Const., art. I, § 16; § 618.)[5] The court recognized that a civil jury must determine all questions submitted to it, and when the jury is composed of 12 persons, each should participate as to each verdict submitted to it. It is sufficient that any nine jurors may arrive at each special verdict, regardless of the individual juror's vote on a prior question. (Resch, supra, at p. 679, 205 Cal.Rptr. 827, 685 P.2d 1178, citing Juarez v. Superior Court (1982) 31 Cal.3d 759, 767-768, 183 Cal.Rptr. 852, 647 P.2d 128; see also 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 359, p. 409 [3/4ths of the jury must agree on all matters essential to the verdict].)
In Earl v. Times-Mirror Co. (1921) 185 Cal. 165, 184-185, 196.P. 57 (Earl), the court upheld a verdict for compensatory damages that was supported by nine votes, but struck down a punitive damages verdict that was supported only by seven votes. This required a reduction of the judgment amount by the punitive damages award that was not adequately supported: "[The] jurors did not concur in the verdict as rendered, and not being willing to join therein, either because this verdict was too large or too small, their votes cannot be now considered as giving validity thereto." (Id. at p. 185, 196 P. 57.) In Earl, the court stated that the matter could have been corrected at trial under section 618, by polling the jury, but since this was not done, "as the record stands, we must conclude that nine jurors concurred in a verdict of only twenty-five thousand dollars *74 against the [defendant]...." (Earl, supra, at p. 185, 196 P. 57.) This meant that the additional verdict for punitive damages failed, "because, so far as the record shows, some of those who voted for the five thousand dollar verdict as punitive damages might not have been willing to vote for a general verdict for as much as or more than twenty-five thousand dollars." (Ibid.)
In Kirby v. Adcock (1953) 116 Cal. App.2d 570, 571, 253 P.2d 700, the appellate court upheld a general damages verdict voted for by nine jurors, but struck down as "ineffective" a punitive damages verdict that did not have the required three-fourths favorable vote. (Id. at p. 571, 253 P.2d 700.) However, the court declined to invalidate the entire verdict, on these grounds: "To sustain this argument would be to give undue weight to procedural technique and to permit substance to become subservient to form." (Ibid.)
In some cases, ambiguity in a special verdict can be resolved, and the verdict upheld, by the court construing its language in the context of the whole record, including the pleadings, evidence and instructions. (See Woodcock v. Fontana Scaffolding & Equipment Co. (1968) 69 Cal.2d 452, 456-457, 72 Cal.Rptr. 217, 445 P.2d 881 (Woodcock).) However, it is not contended here that only a formal defect is presented that could be resolved through construing an ambiguous verdict in light of the governing instructions and pleadings. Instead, the underlying adequacy of the number of votes in this case is argued here, in terms of factual inferences to be drawn from the record, based on the sequence of events at trial.
Fitzpatrick v. Himmelmann (1874) 48 Cal. 588, 589-590, 1874 WL 1405 (Fitzpatrick) stands for these propositions: The trial jury's role is only to find the facts in issue between the parties, and the trial court's office is to determine the legal effect of those facts, by entering judgment in favor of one party or the other, according to the correct effect of the jury's verdict. Although the jury may disagree with the ultimate result, if that verdict is in technical accordance with its findings, there is no error when the trial court follows those findings. Nevertheless, a juror is allowed "to declare, even at the last moment, that the verdict, as presented, is not his verdict" (id. at p. 590), as long as that dissent goes only to the questions of fact determined by the verdict, as opposed to their legal effect: "He is not at liberty to dissent merely because he mistook the legal effect of his verdict, or ascertains from the remark of the Court that the judgment to be rendered upon the verdict will be other than he had supposed." (Ibid.) We next address the manner of this jury's expression of its verdict.

2. Polling Rules
The special verdict signed by the foreman and read by the clerk found that the ninth decision was that Solis was 80 percent responsible for the death, and decedent was 20 percent responsible. The court then told counsel that it was its standard practice to poll the jury, and it proceeded to do so. As stated, out of the 192 potential questions in the verdict to the jurors, two were inadvertently omitted, one regarding the apportionment of fault. The polling process revealed that there were eight votes in open court for an 80/20 percent allocation; one vote for a 90/10 percent allocation, and one vote for a 40/60 percent allocation. When asked what his vote was, Foreperson Santana replied, 50/50 percent. The verdict was recorded and the jury was discharged, and it was not until after that that counsel was asked if there was anything further to discuss.
*75 Although either party may request the jury to be polled, in this case, it was done on the court's own motion. Regardless, this process is designed to reveal mistakes in the signing of a particular form or "that one or more jurors acceded to a verdict in the jury room, but was unwilling to stand by it in open court." (People v. Thornton (1984) 155 Cal.App.3d 845, 858-859, 202 Cal.Rptr. 448.) The procedure of section 618 provides that once the written verdict is read to the jury by the clerk, and an inquiry made collectively as to whether it is their verdict, then the court or clerk may next ask each juror if it is the juror's verdict. (Ibid.) Then, "[i]f upon inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, but if no disagreement is expressed, the verdict is complete and the jury discharged from the case." (Ibid.)
Chipman v. Superior Court (1982) 131 Cal.App.3d 263, 266, 182 Cal.Rptr. 123, followed the court in Fitzpatrick, supra, 48 Cal. 588, 590, by allowing a juror to change her vote as of the time of polling. Chipman was a criminal case that relied on the equivalent statutes to sections 618 and 619, i.e., Penal Code sections 1163 and 1164, setting forth polling procedures.[6] In Chipman, the appellate court rejected arguments that there could have been substantial compliance with those rules, through the earlier balloting that had been conducted. Instead, it stated: "The court failed to establish that the juror's present verdict was anything other than the `No' with which she had responded to the poll. The court thus did not give effect to the right of a juror to change his verdict at any time up to the time that it is finally recorded." (Id, at p. 267, 182 Cal.Rptr. 123.) Since Chipman relies upon general rules in California Supreme Court civil authority (Fitzpatrick, supra, 48 Cal. 588), we disagree with plaintiffs that its principles are restricted to criminal cases, even allowing for the difference between unanimous verdicts in criminal matters and verdicts of nine jurors in civil cases.
In People v. Bento (1998) 65 Cal.App.4th 179, 189-190, 76 Cal.Rptr.2d 412 (Bento), the court addressed, as an issue of first impression in California, "whether the `last moment' for a juror to express dissent expires when the verdict is complete, rather than when the trial court discharges the jury or otherwise loses its ability to shield the jury from outside influences." It was interpreting Fitzpatrick, supra, 48 Cal. 588, where the court said, "any juror is empowered to declare, up to the last moment, that he dissents from the verdict." (Bento, supra, at p. 189, 76 Cal.Rptr.2d 412.) The facts in Bento were: The jury announced that it had reached a verdict on all counts against defendant no. 1, but only a partial one as to defendant no. 2. The jury's verdicts concerning no. 1 were read in open court, and the jurors, when polled, unanimously affirmed that the verdicts as *76 read were their own. The trial court then verified on the record that the jurors had reaffirmed their verdicts and directed the clerk to record these verdicts. Subsequently, the trial court read the verdicts on the resolved counts only as to defendant no. 2, the jury was polled about these verdicts and they were recorded, but the jury had not yet been discharged. (Id. at p. 187, 76 Cal.Rptr.2d 412.) However, "[s]everal minutes later, while counsel and the trial court were discussing the remaining counts against [defendant no. 2], Juror No. 7 requested a conference with the trial court. At this conference, Juror No. 7 stated: `I'm not absolutely sure with reasonable doubt, even though I have tried to be, on counts 1 and 2 on [defendant no. 1].' The trial court noted that 12 to 15 minutes had passed since the jury had been polled on the verdicts concerning [defendant no. 1].... [T]he trial court declined to reconvene the jury, reasoning that the verdicts against [defendant no. 1] had been recorded after the members of the jury had collectively and individually affirmed them, including Juror No. 7, who had voiced no confusion or dissent during the polling." (Id. at pp. 187-188, 76 Cal.Rptr.2d 412.)
In Bento, supra, 65 Cal.App.4th 179, 76 Cal.Rptr.2d 412, the appellate court upheld the verdicts against defendant no. 1, concluding that "when, as here, the verdicts have been collectively and individually confirmed in open court pursuant to these sections and are complete in every detail, jurors are no longer empowered to dissent from the verdicts, and the trial court may not reconvene the jury for further deliberations on the basis of such dissent. In our view, [Pen.Code] sections 1163 and 1164 describe a culminating formal procedure for verifying the unanimity of the jury in open court, and thus they define the moment of transition for when a juror may and may not withdraw his or her affirmation of the verdict. Before the verdict is complete within the meaning of these sections, a juror's expressions of doubt or confusion mandate further deliberations. After the passing of this moment, such expressions are an impermissible attempt to impeach the verdict. In this respect, [Pen.Code] sections 1163 and 1164 define the final moment of the jury's deliberative process." (Bento, supra, at p. 191, 76 Cal.Rptr.2d 412.) The court distinguished other cases that involve different factual situations, such as incomplete or facially imperfect verdicts. (Id. at p. 192, 76 Cal. Rptr.2d 412.)
Individual polling errors do not require reversal in the absence of a showing of prejudice, such as indications of nonunanimity or coercion. (People v. Masajo (1996) 41 Cal.App.4th 1335, 1339-1340, 49 Cal.Rptr.2d 234). However, as next discussed, difficulties frequently arise in analyzing such evidence about jury agreements or disagreements, because Evidence Code section 1150 provides that juror declarations are inadmissible to the extent that they reflect on the jurors' thought processes. (7 Witkin, Cal. Procedure, supra, Trial, § 393, p. 450.)

3. Evidence Code Section 1150 Considerations
Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." *77 As interpreted in People v. Hutchinson (1969) 71 Cal.2d 342, 78 Cal.Rptr. 196, 455 P.2d 132, this section sets forth the framework for analyzing when juror declarations are admissible. Section 1150 properly distinguishes between "proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved ... [citations].... [¶] ... `The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration. [Citations.]' " (Hutchinson, supra, at pp. 349-350, 78 Cal.Rptr. 196, 455 P.2d 132; italics added.) The facts in Hutchinson that amounted to "overt acts" were the bailiffs improper statements to the jury, that could have prompted them to reach a premature verdict, which was an improper influence under Evidence Code section 1150, subdivision (a). (Hutchinson, supra, at p. 351, 78 Cal.Rptr. 196, 455 P.2d 132.)
In Krouse v. Graham (1977) 19 Cal.3d 59, 79-80, 137 Cal.Rptr. 863, 562 P.2d 1022 (Krouse), the Supreme Court resolved claims of jury misconduct that took the form of improper consideration of attorney fee awards as affecting a personal injury verdict. In Krouse, the challenged juror declarations included language such as "`several jurors commented' on their belief that plaintiffs' counsel would be paid one-third of the total award"; or "considered" such a belief in its awards; or "determined" an award by adding money for plaintiffs' legal fees. The Supreme Court found such declarations to be admissible on a motion for a new trial under Evidence Code section 1150, subdivision (a), because "if the jurors in the present case actually discussed the subject of attorneys' fees and specifically agreed to increase the verdicts to include such fees, such discussion and agreement would appear to constitute matters objectively verifiable, subject to corroboration, and thus conduct which would lie within the scope of section 1150." (Krouse, supra, at pp. 80-81, 137 Cal.Rptr. 863, 562 P.2d 1022.) Such conduct is a proper subject of juror declarations, since they are not allowed to make express agreements to include such fees in their verdict, or to engage in extensive discussion evidencing an implied agreement to that effect, and a new trial motion based on jury misconduct can be brought under such circumstances.
Further, in Krouse, supra, 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022, the Supreme Court admitted that the jury declarations "are inconclusive, however, and could be construed as conduct reflecting only the mental processes of the declarant jurors, for they assert that certain unnamed jurors `commented' on the subject of attorneys' fees, and that the jurors `considered' the matter in determining the `final compromise award.' An assertion that a juror privately `considered' a particular matter in arriving at his verdict, would seem to concern a juror's mental processes, and declarations regarding them, accordingly, would be inadmissible under section 1150. It is not clear from the record whether the jury's treatment of attorneys' fees constituted `overt acts, objectively ascertainable' and thus admissible, or rather may more properly be described as evidence of the jury's `subjective reasoning processes' and thus excludable, all as more fully developed in Hutchinson." (Krouse, supra, at p. 81, 137 Cal. Rptr. 863, 562 P.2d 1022.) In Krouse, this issue led the Supreme Court, without reaching the merits, to require the trial court to reconsider the new trial motion on that point, using this evidence that it had previously incorrectly excluded. (Id. at pp. 80-83, 137 Cal.Rptr. 863, 562 P.2d 1022.)
*78 In People v. Lewis (2001) 26 Cal.4th 334, 110 Cal.Rptr.2d 272, 28 P.3d 34 (Lewis), the court applied Evidence Code section 1150 to hold that religious belief references in the jury room to the issues at hand, and resulting discussion between jurors, amounted to part of their individual decisionmaking processes that could not constitute or be proven as reversible jury misconduct. The court said, "[a]lthough Evidence Code section 1150, subdivision (a) permits a court to receive otherwise admissible evidence about matters that may have influenced a verdict improperly, it limits the evidence as follows: `No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.' Thus, `when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.' [Citation.]" (Lewis, supra, at pp. 388-389, 110 Cal.Rptr.2d 272, 28 P.3d 34.)
In Lewis, supra, 26 Cal.4th 334, 110 Cal.Rptr.2d 272, 28 P.3d 34, the court clarified that an example of an admissible juror statement under Evidence Code section 1150, subdivision (a) would be "a statement that reflects a juror's reasoning processes if the statement itself amounts to juror misconduct, comparable to an objective fact such as reading a novel during trial, or consulting an outside attorney for advice on law relevant to the case. [Citation.]" (Lewis, supra, at p. 389, 110 Cal.Rptr.2d 272, 28 P.3d 34, italics added.) Likewise, juror declarations would be allowed to describe how another juror disregarded a court's instruction, consulted his own outside experience, or shared his own erroneous legal advice with other jurors. (Ibid.) "These distinctions underscore the privacy and sanctity of jury deliberations, i.e.,'"the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved."' [Citations.]" (Id, at p. 391, 110 Cal.Rptr.2d 272, 28 P.3d 34.)
In Silverhart v. Mount Zion Hospital (1971) 20 Cal.App.3d 1022, 1029, 98 Cal. Rptr. 187 (Silverhart), the court discussed the issue of when jury declarations can be used to impeach a verdict. Under Evidence Code section 1150, subdivision (a), one juror's declaration was deemed inadmissible, because it showed only her mental processes and those of her fellow jurors, and the subjective considerations which influenced her verdicts. That declaration contained statements such as "`[i]n truth, three-fourths of such jurors at that time were not in agreement as to a verdict in this action,'" and "`[i]t is my honest opinion that this matter was not fully deliberated upon by the jury, and that the verdict as rendered was unfairly arrived at and coerced by the circumstances surrounding the reading of such verdict while in the courtroom; and after it had been mistakenly announced that the jury had arrived at a verdict.'" (Silverhart, supra, at p. 1030, 98 Cal.Rptr. 187.) To hold these were inadmissible, the appellate court relied on Hutchinson, supra, 71 Cal.2d 342, 349-350, 78 Cal.Rptr. 196, 455 P.2d 132 (the statements were not overt conduct, conditions, or events). (Silverhart, supra, at p. 1029, 98 Cal.Rptr. 187.) The appellate court upheld a lower court ruling to deny a new trial motion, because the trial court had given weight to the juror's affirmative statement in court, and no abuse of discretion was found. (Id. at pp. 1029-1031, 78 Cal.Rptr. 196, 455 P.2d 132.) In any case, her vote was not essential to the verdict, since there were nine other such votes. (Ibid.)
*79 Using these standards and others to be stated, we evaluate this record.

4. Factual Showing: Number of Votes
At the new trial stage, and earlier at the "invalidation" motion, defendants submitted juror declarations from Foreperson Santana and Juror Rae Woods, giving details of the deliberations and voting. As relevant here, Santana stated that Juror No. 7, Brown, refused to answer the apportionment of liability question. Santana also addressed many other topics and problems in the jury room, to be described later as necessary. Juror No. 2, Woods, confirmed that Juror No. 7 would not answer the allocation of liability question no. 9 on the form, and she also addressed other topics and problems (which will be deferred here; see pt. Ill, post; also, we must point out that the trial court ultimately sustained plaintiffs' objections to the above two declarations that described Brown's vote in this way).
Plaintiffs filed their opposition, including four juror declarations that contradicted those submitted by defendants on various topics, including the vote on the allocation of liability. As relevant here, Juror Martha Bingham stated that Santana had originally said in the jury room that plaintiff should have 100 percent of the liability, but by the end of the deliberations, Santana voted, in a vote "taken by going around the table," to go along with the 80/20 fault apportionment.
Next, Juror No. 7, Brown, stated that Santana agreed in the final vote and tally to the 80/20 liability apportionment, so that he thought there were at least nine final votes for 80/20. Brown voted for a 100/0 percent apportionment against defendants.
Next, Juror No. 12, Whalen, stated that the jurors had discussed the fault apportionment during the deliberations, and an early vote was 90 percent for defendant and 10 percent for plaintiff. She declared, "by the end of the deliberations, the jurors agreed on 80 percent for Mr. Solis and 20 percent for Mr. Keener, and that fault apportionment was our eventual verdict. Mr. Santana was one of the jurors who agreed with that apportionment and who ultimately voted in favor of the 80-20 split."
Next, Juror No. 1, June Scopinich, described the first five minutes of the jury deliberations, in which Santana and two others wanted to rule for 100 percent negligence of plaintiff, while Juror No. 7, Brown, stated the opposite. She continued, "[a]s the deliberations progressed, most of the jurors stated they wanted to hold Mr. Solis negligent and assessed fault at 90% for him and 10% for Mr. Keener, although some votes were 100% for Solis and 0% for Mr. Keener. After further deliberations, we took additional votes on the apportionment. In the final vote, there were at least nine jurors, including Mr. Santana, who voted in favor of an 80%-20% apportionment, with 80% fault for Mr. Solis and 20% fault for Mr. Keener. Mr. Brown dissented from that vote and remained at 100% for Mr. Solis and 0% for Mr. Keener. [¶] Before the jurors left the jury room, Mr. Santana said, `Let me read off my white form.' This was the verdict form that would list everything on which we had agreed. He then read off the form the answers to the various questions, including the amount of the damages. Included in his list was the 80%-20% apportionment of fault for which at least nine jurors had voted. Mr. Santana then said, `that's what we all agreed on.' We all stated that was correct. This was just before leaving the jury room and returning to the courtroom. [11] After juror Santana had signed and dated the verdict form, the jury went into the courtroom. The judge then asked Mr. Santana whether *80 the jury had arrived at a verdict. He responded that the jury had done so. The Court then polled the jury, asking each juror whether the verdict recorded by Mr. Santana was the verdict of that juror. Inasmuch as Mr. Santana was one of the last jurors polled (I was the first polled), his answers were given toward the end. During that process, I heard Mr. Santana state that the verdict indicated on the verdict form was not his verdict. My head snapped up. Insofar as the fault apportionment is concerned, Mr. Santana's statement was inconsistent with the last vote he had expressed on that issue in the jury room."
In denying the new trial motion, the trial court's ruling was to consider these juror declarations, but then to deem them admissible only for whether a particular juror gave a yes or no vote on a particular issue, as "objectively ascertainable conduct" that was admissible evidence. The court found that the four plaintiffs' juror declarations were credible, that Santana had voted yes on the 80/20 apportionment in the jury room. The court also noted that Santana's declaration was "conspicuously silent as to his vote on apportionment," and the court concluded that his assertion as jury foreperson that the jury had reached a verdict, coupled with the plaintiffs' four juror declarations, led the court to conclude that there were actually nine votes for an 80/20 apportionment, one of which was Santana's, "notwithstanding his inexplicable and dubious statement at polling that he had voted for a 50/50 apportionment." For that reason, the court excluded the evidence of Santana and Woods, as well as Brown's on the subject of how Brown had voted, as irrelevant and admissible. The court denied the new trial motion and found the verdict was valid.
Here, as in Krouse, supra, 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022, these jury declarations could theoretically be construed either way: (a) As conduct reflecting only the mental processes of those jurors and their fellows, in making comments, or considering certain matters in order to make a compromise award; or (b) "overt acts, objectively ascertainable" (here, jury voting around the table or agreements among themselves). However, we think the better view is that even the strongest evidence in the declarations, that "a vote was taken going around the table," is not an overt act, but is rather an integral part of the decisionmaking process, and as such, not the proper subject of jury declarations. These were not admissible juror statements under Lewis, supra, 26 Cal.4th 334, 110 Cal.Rptr.2d 272, 28 P.3d 34, such as a statement that "itself amounts to juror misconduct, comparable to an objective fact." (Id. at p. 389, 110 Cal.Rptr.2d 272, 28 P.3d 34.) Rather, these statements expressly go to the "back and forth" in the jury room that led to the written verdict, and they do not constitute misconduct, such as could be objectively shown. By the time the polling was conducted, the written verdict was unsupported, because it is not misconduct for a juror to change his vote up to the last moment, i.e., before the verdict is recorded. (Bento, supra, 65 Cal.App.4th at pp. 191-192, 76 Cal.Rptr.2d 412.) Under Hutchinson, supra, 71 Cal.2d 342, 78 Cal.Rptr. 196, 455 P.2d 132, it is a proper use of a juror declaration to prove there were `Improper influences" that justify impeachment of a verdict, such as those perceptible by the senses. (Id. at pp. 349-350, 78 Cal.Rptr. 196, 455 P.2d 132.) The facts here are not of improper influences, but of the jury members' decisions how to vote at various times.
We conclude the trial court erred in accepting the juror declarations to inquire into and resolve the results of the *81 jury's decisionmaking process, and also when it made a credibility determination that Santana could not effectively have voted other than 80/20 at any relevant time. Although the statement of Santana as jury foreperson that the jury had reached a verdict, and the court's reading of it, would have otherwise supported the validity of that written verdict, that support was insufficient in light of the disagreements now disclosed by the record. Any juror is empowered to declare, up to the last moment, that he or she dissents from the verdict. (Fitzpatrick, supra, 48 Cal. 588 at pp. 589-590.) Santana was entitled to change his vote up until the time the verdict was recorded. The problem here was that no one noticed it at the time, and the trial court ordered the unsupported verdict recorded, before giving defense counsel or anyone else an opportunity to seek corrections or make any objections.
Under Bento, supra, 65 Cal.App.4th 179, 76 Cal.Rptr.2d 412, Santana's dissent was not too late, because the verdicts were never "collectively and individually confirmed in open court" (id. at p. 191, 76 Cal.Rptr.2d 412), and they were not complete in every detail, before the vote change. The trial court could have reconvened the jury for further deliberations on the basis of such dissent, but for many reasons, this was not done. We accordingly conclude from this record that there was no essential ninth vote on the special verdict for apportionment of liability. We turn now to whether this defect could be waived under these circumstances.

5. Application of Waiver Rules
Under section 619, an informal or insufficient verdict that does not cover the issues submitted may be corrected by the jury under the advice of the court, or the jury may again be sent out. There is no waiver of objections to an ambiguous verdict, where a failure to object is not gamesmanship. (Woodcock, supra, 69 Cal.2d at p. 456, 72 Cal.Rptr. 217, 445 P.2d 881.) Also, where an inconsistent verdict is rendered that is an impossibility under the facts of the case, such inconsistency can be preserved for consideration on appeal as error, even without an objection. (Remy v. Exley Produce Exp., Inc. (1957) 148 Cal.App.2d 550, 307 P.2d 65 (Remy).)
In Henrioulle, supra, 20 Cal.3d 512, 521, 143 Cal.Rptr. 247, 573 P.2d 465, the jury polling revealed that there were at least nine jurors in that case who agreed on each of the four findings of fact, but not always the same nine jurors. The Supreme Court held that where there was an alleged defect in the verdict that was "apparent" at the time the jury was polled, and that could have been cured by further deliberation, the aggrieved party's failure to object at that time waived the alleged defect and precluded the trial court from invoking it to grant a new trial. The Supreme Court reached this conclusion to uphold the judgment even though the trial court concluded that the same nine jurors had not assented to each question of the special verdict, which was considered a formal defect at the time (id. at p. 522, 143 Cal.Rptr. 247, 573 P.2d 465; but this is no longer true after Juarez, supra, 31 Cal.3d 759, 183 Cal.Rptr. 852, 647 P.2d 128). In Henrioulle, the court acknowledged that a waiver rule will not apply when the verdict is itself inconsistent, because such an inconsistent verdict is not subject to being "corrected." (Henrioulle, supra, at p. 521, fn. 11, 143 Cal.Rptr. 247, 573 P.2d 465, citing Remy, supra, 148 Cal.App.2d 550, 307 P.2d 65.)
In Silverhart, supra, 20 Cal.App.3d 1022, 98 Cal.Rptr. 187, the appellate court dealt with a similar waiver problem after polling. First, the court said that even *82 where there was juror confusion expressed at the polling stage, a claim of inadequate jury agreement could be deemed waived where there was no adequate objection at trial. There, the facts were that at polling, eight jurors said the verdict was theirs, three said it was not, and one said, "Yes, I voted." At a second polling, a vote was 10 in favor of the verdict and two against. Based on a waiver theory, the Court of Appeal rejected a claim that there were inadequate votes to uphold the verdict, based on the lack of objection at the time the jury was polled, and because there had been no request to have the jury sent out again on the ground that more than one-fourth of the jurors disagreed with the verdict as returned. (Id. at pp. 1028-1031, 98 Cal.Rptr. 187.) In any case, the court noted that the verdict should be upheld where possible, and there were at least 10 votes declared, so that was adequate. (Ibid.)
In Portman v. Keegan (1939) 31 Cal. App.2d 30, 34, 87 P.2d 400, the jury returned a verdict that only resolved the cross-complaint, while entirely omitting the issues raised by the complaint. The court decided to uphold the verdict as to the cross-complaint, because there had been no objection to the issues that were resolved. However, the court also ruled that there had been no waiver as to the issues in the complaint that were never resolved by the jury, so that reversal would be ordered to allow trial to take place on the complaint (if a remittitur of damages was not accepted). Thus: "The effect of the waiver under these circumstances is simply to estop the plaintiffs from questioning the validity of the verdict as far as it went, but it does not affect the right of the plaintiffs to have the issues raised on their complaint submitted for ah adjudication. It will be further noted that the judgment entered by the clerk goes no further than the verdict, and it cannot be said, so far as the record goes, that the issues raised by the complaint were ever adjudicated." (Id. at p. 34, 87 P.2d 400.) In Irelan-Yuba Gold Quartz Mining Co. v. Pacific Gas & Electric Co. (1941) 18 Cal.2d 557, 571, 116 P.2d 611, the Supreme Court relied on the Portman case to say that if all the issues are not determined by the verdict, and there is no objection, "then the verdict stands as to the issues included therein, but as to the remaining issues the matter is set at large and further proceedings should be had in the trial court to adjudicate those issues."
Here, the trial court told counsel that it was its standard practice to poll the jury, and it proceeded to do so. The jury was then discharged. Only then did the court ask counsel if there was anything further, and defense counsel said "nothing at all." Two days later, when the court became aware that two of the special verdict questions had been omitted as to Juror No. 7, it notified the parties and took briefing on the matter, but ultimately denied defendants' motions to invalidate the verdict or for new trial, finding any such claims had been waived.
We disagree, and cannot find this was a waiver of an apparent defect. This was not a formal matter about an ambiguous verdict that could be clarified through construing it according to the instructions or otherwise. Nor was it a facially inconsistent verdict that needed corrections. Rather, this was an unexpected change in vote, in a proceeding that was so confusing that no one, including the court and counsel, noticed that one juror was not questioned about an essential matter, nor that the foreperson had orally answered that he disagreed with the written verdict that he had just presented. Instead, he surprised everyone, but the record shows that his change of vote was announced before the *83 verdicts were recorded. There was no realistic opportunity for defense counsel to object to the polling procedure and the recording of the verdict, even if an error had been noticed. Instead, the trial court took the matter out of counsel's hands and the change in vote, which was permissible, was overlooked. Regrettably, this removed the ninth vote from the apportionment verdict, and there was a failure to find on that issue. In both Henrioulle, supra, 20 Cal.3d 512, 143 Cal.Rptr. 247, 573 P.2d 465 and Silverhart, supra, 20 Cal.App.3d 1022, 98 Cal.Rptr. 187, there were at least nine votes to support a verdict at the time the waiver occurred. It is true that nine votes was not enough at the time in Henrioulle, where there were different special verdicts agreed to by different jurors, and that was considered defective at the time. Nevertheless, we think the Supreme Court found that particular defect could be waived because it was less severe than an eight-vote special verdict, the defect in this case.[7]
Moreover, we disagree with plaintiffs that under section 618, this special verdict should be upheld because "no disagreement" was expressed by more than one-fourth of the jurors, upon polling. Eight jurors orally agreed with the 80/20 apportionment, and the others voted orally, respectively, 90/10, 40/60, 50/50 (not counting the missing vote). Plaintiffs apparently rely on the missing vote to say that only three disagreements were "expressed," and defendants waived any objection to the missing vote. However, the missing vote is essentially a disagreement, so there are more than three jurors who "disagreed" under section 618.
Further, there is no basis to uphold the verdict on the grounds that there was supposedly or effectively a ninth vote in the form of the 90/10 vote by another juror. At the new trial motion, defendants' attorney speculated the foreman might have believed that was so when the verdict was signed. However, the reader should imagine for a moment that there were seven votes for 80/20 and five votes for 90/10; could we deem that there were approximately nine votes for 80/20 in that circumstance? No, and we cannot do so here. Under Earl, supra, 185 Cal. at pages 184, 196 P. 57 to 185, jurors can reject a verdict as too large or too small. Likewise, we cannot deem the tentatively expressed 100/0 vote by the omitted juror (No. 7), to be a completion of the verdict, even if the declarations are accepted, since Juror No. 7 had also expressly told the other jurors he abstained from voting on the apportionment. Juror No. 7 would have had the power to vote on apportionment even though he disagreed with the substantial factor assessment, because the votes of any nine jurors are now sufficient to uphold a verdict, but he did not do so. Therefore, we cannot in good conscience construe this eight-person vote as actually a nine, 10, or 11 person vote for the 80/20 verdict. That would be a legal fiction and an unsatisfactory resolution of this highly disputed issue. Here, as in Portman v. Keegan, supra, 31 Cal.App.2d 30, 34, 87 P.2d 400, this verdict omitted to resolve the final issue, apportionment, and there should be no waiver as to the issues that were never resolved by the jury.
Finally, none of these problems could be cured at the new trial stage, when the trial court erroneously decided it had the power *84 to overrule Foreperson Santana's oral change in vote at polling, by finding that Santana's declaration was inadequate, because it did not deny allegations by, other jurors that he had actually earlier provided the ninth vote for apportionment of 80/20 in the jury room. The court abused its discretion in believing the other jurors over Santana's "inexplicable and dubious statement at polling that he had voted for a 50/50 apportionment." This was an impermissible use of the jury declarations, to inquire into their decisionmaking process, and it did not apply or reflect correct polling proceedings.
An individual polling error may justify reversal where there has been a showing of prejudice, such as an indication of nonunanimity. (People v. Masajo, supra, 41 Cal.App.4th 1335, 1339-1340, 49 Cal.Rptr.2d 234.) Such is the case here.

6. Scope of New Trial
We next consider the effect of an inadequate verdict on apportionment of liability, in the context of the entire case. The special verdict found that decedent's conduct was a substantial factor in causing his death, as was the conduct of Solis. The allocation of liability remained to be resolved next, but we have found that portion of the special verdict defective. The next question is whether the entire matter must be retried, or whether only the apportionment special verdict remains for resolution upon remand, with a second jury instructed that the previous eight questions were resolved.
Defendants cite to Valentine v. Baxter Healthcare Corp. (1999) 68 Cal.App.4th 1467, 1478-1479, 81 Cal.Rptr.2d 252, in which the appellate court upheld the power of a trial court to reserve, for the entry of judgment, certain causes of action (fraud and strict liability that were determined at the first trial in favor of defendant), while ordering a partial mistrial on a remaining unresolved cause of action, negligence. Once the second trial jury had resolved certain essential issues regarding negligence, but deadlocked on others, the appellate court further ruled that the trial court had properly directed judgment in favor of the defendant on an alternate theory of negligence that was closely enough related to the previously resolved strict liability theory. The appellate court reasoned that a retrial of a limited issue can appropriately be ordered, "so long as that issue is sufficiently distinct and severable from the others." (Id. at p. 1478, 81 Cal.Rptr.2d 252.) I
n that case, the relationship of the various causes of action was such that "a limited retrial would not result in an injustice: [Citations.] And, where special verdicts on one matter do not depend on inconclusive special verdicts on another matter, the remaining matter can properly be determined on retrial. [Citation.] [¶] The trial court correctly ruled that negligence was separate and severable from the independent causes of action for strict liability and fraud. It was separately pled, separately covered on the verdict form, and subject to separate instructions." (Id. at pp. 1478-1479, 81 Cal. Rptr.2d 252.) The reasons for allowing those various causes of action to be resolved separately, as a matter of law, were that the statutory scheme allowed it, and also "the policy of this state [is] to promote judicial economy. Where jury efforts on special verdicts can be preserved rather than lost and issues thus narrowed upon which evidence must be taken at trial and upon which a second 
jury must deliberate and decide, the burden on the parties and the courts is reduced." (Id, at p. 1480, 81 Cal.Rptr.2d 252.)
In Valentine, supra, 68 Cal.App.4th 1467, 81 Cal.Rptr.2d 252, the court distinguished Falls v. Superior Court (1987) 194 *85 Cal.App.3d 851, 855, 239 Cal.Rptr. 862 (Falls), because in Falls, "the partial special verdict failed to dispose of all elements of a single cause of action for negligence. There, the jury resolved the issue of the defendant's negligence but did not resolve the issue of liability in the plaintiffs favor since it did not reach the issue of the plaintiffs comparative negligence, if any, or the contributory negligence of the settling defendant. [Citation.]" (Valentine, supra, at p. 1479, 81 Cal.Rptr.2d 252.) In Valentine, by contrast, the court concluded, "[t]his was a case calling for special verdicts that would pinpoint the jury's fact finding and enable judgment to be entered rather than prolonging litigation with a possible third trial." (Id. at p. 1488, 81 Cal.Rptr.2d 252.)
Defendants seek to have us apply the strict approach of Falls, supra, 194 Cal. App.3d 851, 239 Cal.Rptr. 862. Admittedly, this case is not as clean as the Valentine case is, with respect to the nature of the matters previously resolved and those remaining to be resolved. Plaintiffs' wrongful death case is based on negligence, and is defended on comparative negligence. This is only a single cause of action, as opposed to the three different theories involved in Valentine. Nevertheless, the special verdicts as rendered resolved much more than the jury was able to do in Falls, because the jury did reach and resolve the very important substantial factor causation issuesthat both Keener and Solis engaged in conduct that was a substantial factor in causing the harm. This case resembles a hypothetical situation outlined in Valentine: "[W]here special verdicts on one matter do not depend on inconclusive special verdicts on another matter, the remaining matter can properly be determined on retrial. [Citation.]" (Id. at p. 1478, 81 Cal.Rptr.2d 252.) The apportionment verdict can be resolved separately.
Notwithstanding the above considerations, the validity of the verdict and judgment as a whole depends upon a lack of other prejudicial error, as we will next discuss in part III, post. At this point, we are satisfied that it would be an unacceptable waste of judicial resources to go back to square one, where there are eight special verdicts that were adequately resolved (if we determine that they are not infected by prejudicial error, as we will next discuss). Even though the apportionment of liability issues will require some repetition of the basic negligence evidence at any retrial, the issues can be cut down considerably and the jury instructed accordingly. This would be especially appropriate in this case where the problems in taking the verdict cannot be attributed to only one participant; here, the jury foreperson, the trial court, and both counsel all must bear some part of the responsibility in allowing this unfortunate series of events. Therefore, assuming no other reversible error is found, the remedy we will order will be to reverse the judgment in part with directions to the trial court to implement the existing special verdict as to its first eight questions, while allowing such further proceedings as may be appropriate on apportionment of liability only.

III[**]

DISPOSITION
The judgment is reversed in part with directions to the trial court to conduct such further proceedings as will implement the existing special verdict as to its first eight questions and answers, while allowing appropriate additional proceedings on the issue of apportionment of liability only. *86 Each party is to bear its own costs on appeal.
WE CONCUR: HALLER and AARON, JJ.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.
[1] Plaintiffs and respondents Theresa Keener, Midah Keener, and Elizabeth Keener are the widow and adult children survivors of E. Scott Keener, the motorcyclist killed in the subject motor vehicle accident. Originally, they also sued Penske Trucking, the company which leased the driver's truck to his employer, but that matter was settled before trial.
[2] These facts will be presented in a somewhat abbreviated fashion, to be fleshed out in connection with the particular arguments on appeal.
[3] Evidence was excluded that Solis was convicted of manslaughter because of the accident.
[4] In this appeal, we are concerned only with one of the missing answers from Brown. Regarding the other (decedent's negligence as a substantial factor in causing the death), there were 11 votes that it was, even without Brown. However, on the crucial comparative fault issue, eight jurors told the court that they were in favor of an 80/20 allocation, one voted for a 90/10 allocation, one voted for a 40/60 allocation, and the foreperson told the court he had voted for a 50/50 allocation. The latter oral vote by Foreperson Santana was later disputed in jury declarations, when other jurors said they observed and believed that he was one of the 80/20 votes in the jury room, as will be further discussed in part II, post.
[5] Section 618 provides: "When the jury, or three-fourths of them, have agreed upon a verdict, they must be conducted into court and the verdict rendered by their foreperson. The verdict must be in writing, signed by the foreperson, and must be read to the jury by the clerk, and the inquiry made whether it is their verdict. Either party may require the jury to be polled, which is done by the court or clerk, asking each juror if it is the juror's verdict. If upon inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, but if no disagreement is expressed, the verdict is complete and the jury discharged from the case."
[6] Penal Code 1163 is similar to section 618 regarding polling, by providing that either party can request this: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation." Penal Code section 1164 is similar to both sections 618 and 619, and deals with recording the verdict in court minutes, reading the verdict to the jury, polling the jury, entry of dissent, further deliberation, verification of the verdict or inability to reach a verdict on all issues, and discharge of the jury. As relevant here, the language most comparable to section 619 is: "If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case."
[7] It is also possible to view the written verdict as inconsistent with the oral verdict as disclosed by the polling. Inconsistent verdicts can be reviewed on appeal even if not objected' to below. (See Henrioulle, supra, 20 Cal.3d 512 at p. 521, fn. 11, 143 Cal.Rptr. 247, 573 P.2d 465.)
[**] See footnote *, ante.